**In re INDUSTRIAL CERAMICS, INC., Debtors.**

**The Official Creditors Committee of Industrial Ceramics, Inc., Plaintiffs,**

v.

**Industrial Ceramics Associates, and ABB Power Tool & Die Company, Inc., Defendants.**

**Nos. 98–2076, 96–22069.**

United States Bankruptcy Court, W.D. New York.

March 14, 2000.

---

Lawrence C. Gottlieb, Scott E. Rusczyk, Kronish Lieb Weiner & Hellman, LLP, New York, NY, for Industrial Ceramics, Inc., Debtor.

## DECISION & ORDER

JOHN C. NINFO, Chief Judge.

### BACKGROUND

On April 8, 1996, Industrial Ceramics, Inc. ("Industrial Ceramics"), which manufactured specialty, made-to-order porcelain insulators used in electronic power transmission and distribution, filed a petition in the United States Bankruptcy Court for the Eastern District of New York initiating a Chapter 11 case. Thereafter the case was transferred to the United States Bankruptcy Court for the Western District of New York (the "Court"). An Official Unsecured Creditors Committee (the "Committee") was appointed in the case which was authorized by the Court to commence an Adversary Proceeding against Industrial Ceramics Associates ("Associates") and ABB Power Tool & Die Company, Inc. ("ABB") to have the Court determine whether certain transfers to those entities could be avoided pursuant to the provisions of the Bankruptcy Code, the New York Business Corporation Law Section 513 (the "BCL") or the New York Debtor & Creditor Law (the "NYDCL").

On April 6, 1998, the Committee commenced its Adversary Proceeding against Associates and ABB (the "Avoidance Proceeding"). The Committee's Complaint in the Avoidance Proceeding alleged that: (1) prior to the filing of its petition, Industrial Ceramics operated a facility in Derry, Pennsylvania (the "Derry Facility") which it referred to as its large tube division; (2) Industrial Ceramics had acquired the tangible personal property and related intangibles at the Derry Facility from Westinghouse Electric Company ("Westinghouse") or an affiliate, at the same time that Associates purchased the underlying real property (the "Derry Real Estate"); which Associates then leased to Industrial Ceramics (the "Derry Lease"); (3) Industrial Ceramics purchased the tangible personal and intangible property from Westinghouse in exchange for a promissory note which was later converted into 4,875,-

281 shares of Class A redeemable preferred stock in Industrial Ceramics (the "Preferred Stock"); (4) ABB became the holder of the Preferred Stock and along with it also acquired the rights to: (a) appoint one director to the Industrial Ceramics Board of Directors; and (b) to approve or disapprove of any proposed sale or other disposition of a substantial portion of the company's assets; (5) ABB also became the holder of a mortgage (the "Derry Mortgage") which had been granted to Westinghouse by Associates in connection with its purchase of the Derry Real Estate; (6) ABB exercised its right to appoint or elect a director to the Industrial Ceramics Board of Directors, and that director served on the Board during the year 1995; (7) from 1985, when Industrial Ceramics began its business operations, through the end of 1995 it had sustained losses in excess of $10,000,000.00; (8) in mid–1995, at a time when there was a pending labor union strike at the Derry Facility, Industrial Ceramics announced the closing of the Facility and its willingness to sell the large tube divisions; (9) in November 1995, Lapp Insulators, Inc. ("Lapp") agreed to purchase substantially all of the large tube division assets for $3,000,000.00 in cash and future contingent payments based upon customer retention business (the "Deferred Payment Component"); (10) because the sale to Lapp (the "Lapp Sale") was of a substantial portion of the assets of Industrial Ceramics, it required the approval of ABB; (11) the Lapp Sale also required the approval of LaSalle Business Credit, Inc. ("LaSalle"), which held a perfected security interest in some or all of the assets that were being sold to Lapp as security for a Revolving Credit Term Loan and Security Agreement (the "LaSalle Loan Documents"), since the Lapp sale was to be free and clear of all liens and encumbrances; (12) in a Tenth Amendment to the LaSalle Loan Documents, Industrial Ceramics acknowledged that it was in default under a number of the provisions of the Documents,

including a number of financial covenants; (13) on or about November 10, 1995, Industrial Ceramics entered into a Stock Redemption Agreement (the "Redemption Agreement") whereby it agreed to redeem the Preferred Stock held by ABB for the sum of $25,000.00 in cash together with the execution and delivery to ABB of an Assignment Agreement (the "Assignment") by and between ABB, Industrial Ceramics and Lapp, whereby Industrial Ceramics assigned to ABB all of its right, title and interest in and to the Deferred Payment Component which might become due from Lapp; (14) ABB provided its approval of the Lapp Sale; (15) on November 10, 1995, Industrial Ceramics entered into an agreement with Associates which: (a) extended the Derry Lease through December 31, 1998[1]; (b) reduced the monthly rent due under the Lease by $5,000.00 per month; (c) provided for the payment to Associates of past due rent in the amount of $315,-600.00; (d) provided for a lease extension fee to be paid to Associates in the amount of 300,000.00; and (e) provided for the prepayment of rent in the amount of $59,-400.00; (16) on November 10, 1995, Associates and ABB entered into a Forbearance Agreement (the "Forbearance Agreement") in connection with the Derry Mortgage, which was in default at the time, whereby ABB agreed to forbear from enforcing its rights under the Mortgage in consideration of the receipt from Associates of $675,000.00; (17) in connection with the closing of the Lapp Sale, Industrial Ceramics directed Lapp to pay $700,000.00 of the purchase price directly to ABB; (18) at the time of the Lapp Sale, Howard Jacobs, Esq. ("Jacobs") was an officer or director of Industrial Ceramics and of the corporate general partner of Associates, as well as a partner in the law firm of Rosenman and Collin, LLP, the firm which represented both Industrial Ceramics and Associates in connection with the various agreements entered into between and among Industrial Ceramics, Associates,

---

1. The Derry Lease terminated by its terms on December 1996.

Lapp and ABB; (19) when $700,000.00 of the proceeds of the Lapp Sale were paid over to ABB at the direction of Industrial Ceramics, Industrial Ceramics was insolvent as that term is defined in both the Bankruptcy Code and BCL § 102(8)[2] ("Equitable Insolvency"); (20) after the closing of the Lapp Sale and the payment of $700,000.00 to ABB in November 1995, and before Industrial Ceramics filed its petition initiating a Chapter 11 case on April 8, 1996, various creditors of Industrial Ceramics obtained judgments against it; (21) Industrial Ceramics was in default on a number of obligations that it had to creditors when it entered into the various agreements with Lapp, Associates and ABB, as well when they were performed; (22) upon information and belief, ABB set-off $28,302.00 that it owed to Industrial Ceramics against unidentified claims which it asserted against Industrial Ceramics; (23) Industrial Ceramics incurred operating losses for each month after the closing of the Lapp Sale through the date of the filing of its bankruptcy petition; and (24) when Industrial Ceramics, Associates and ABB entered into their various agreements in connection with the Lapp Sale, they knew or had reason to know that Industrial Ceramics would continue to incur financial losses after the closing.

The Complaint in the Avoidance Proceeding then set forth ten separate causes of action, briefly summarized as follows:

### 1. FIRST CAUSE OF ACTION:

Industrial Ceramics is entitled to avoid the transfers to ABB of the $700,000.00 and the Deferred Payment Component because they were transfers in consideration of the redemption of ABB's Preferred Stock in violation of BCL § 513(a) and (c)[3];

### 2. SECOND CAUSE OF ACTION:

The transfers to ABB of the $700,000.00 and the Deferred Payment Component were made by Industrial Ceramics for less than a fair, equivalent consideration, and thus were constructively fraudulent and avoidable pursuant to Section 273 of the NYDCL and Section 548(a) of the Bankruptcy Code, and recoverable pursuant to Section 550 of the Bankruptcy Code;

### 3. THIRD CAUSE OF ACTION:

The transfers to ABB of the $700,000.00 and the Deferred Payment Component were made by Industrial Ceramics with the intent to hinder, delay and defraud its creditors, and thus were fraudulent and avoidable pursuant to NYDCL Section 276 and Section 548(a) of the Bankruptcy Code, and recoverable pursuant to Section 550 of the Bankruptcy Code;

### 4. FOURTH CAUSE OF ACTION:

The transfer of $675,000.00 by Lapp to ABB at the direction of Industrial Ceramics was made to ABB for the benefit of Associates and as part of a scheme to redeem the Preferred Stock, and as such was a transfer: (a) made with respect to an antecedent obligation owing to Associates; (b) made while Industrial Ceramics was insolvent; (c) which had the effect of

---

**2.** BCL § 102(8) provides:

"Insolvent" means being unable to pay debts as they become due in the usual course of the debtor's business.
BCL § 102(8) (2000).

**3.** BCL § 513(a) provides that:

(a) A corporation, subject to any restrictions contained in its certificate of incorporation, may purchase its own shares, or redeem its redeemable shares, out of surplus except when currently the corporation

in insolvent or would thereby be made insolvent.
BCL § 513(c) provides that:
(c) A corporation, subject to any restrictions contained in its certificate of incorporation, may redeem or purchase its redeemable shares out of stated capital except when currently the corporation is insolvent or would thereby be made insolvent and except when such redemption or purchase would reduce net assets below the stated capital remaining after giving effect to the cancellation of such redeemable shares.
NY BUS. CORP. § 513(a) and (c) (1996).

allowing Associates and ABB to receive more than they would have received if there had not been a transfer and Industrial Ceramics had filed a Chapter 7 case; and (d) which ABB knew was fraudulent and preferential, and, therefore, the transfer is avoidable pursuant to Sections 273 and 276 of the NYDCL and Sections 548(a) and 547(b) of the Bankruptcy Code, and recoverable pursuant to Section 550 of the Bankruptcy Code;

5. FIFTH CAUSE OF ACTION:

The transfer of $675,000.00 by Lapp to ABB at the direction of Industrial Ceramics was made without fair or equivalent consideration within the year before the filing of the Industrial Ceramic's petition while it was insolvent, and, therefore, was constructively fraudulent pursuant to Section 273 of the NYDCL and Section 548(a) of the Bankruptcy Code, and recoverable pursuant to Section 550 of the Bankruptcy Code;

6. SIXTH CAUSE OF ACTION:

The transfer of $675,000.00 by Lapp to ABB at the direction of Industrial Ceramics for the benefit of Associates was made with the intent to hinder, delay and defraud the creditors of Industrial Ceramics, and thus was avoidable and recoverable pursuant to the NYDCL and the Bankruptcy Code;

7. SEVENTH CAUSE OF ACTION:

Associates and ABB aided, abetted and assisted the officers and directors of Industrial Ceramics in wasting its assets by making the fraudulent and preferential transfers, so that the $700,000.00 paid to ABB by Lapp at the direction of Industrial Ceramics, as well as the value of the assigned Deferred Payment Component, is recoverable from Associates and ABB;

8. EIGHTH CAUSE OF ACTION:

Because the transfers in question were made with the intent to hinder, delay and defraud the creditors of Industrial Ceram-

ics, costs and attorneys fees are recoverable from Associates and ABB pursuant to Section 276(a) of the NYDCL;

9. NINTH CAUSE OF ACTION:

The $28,302.00 offset affected by ABB within ninety days of the filing of the Industrial Ceramic's petition is recoverable as either a fraudulent conveyance, since there is no claim that ABB held at the time against Industrial Ceramics, or as a preferential transfer pursuant to Section 547(b) of the Bankruptcy Code; and

10. TENTH CAUSE OF ACTION:

The claims of Associates and ABB against Industrial Ceramics should be subordinated pursuant to Section 510 of the Bankruptcy Code because the transfers that were made to them when Industrial Ceramics was: (a) insolvent; (b) engaged in a litigation; (c) suffering from losses; (d) unable to pay its debts as and when they fell due; (e) incurring debt that could not be paid when due; and (f) undercapitalized and in need of debt relief.

On April 5, 1999, after: (1) ABB and Associates had interposed Answers to the Complaint; (2) the Court had conducted a number of pretrial conferences; and (3) a number of discovery disputes had been resolved, the Committee made a Motion for Summary Judgment (the "Motion for Summary Judgment"). The Motion for Summary Judgment included as exhibits various items which the Committee asserted were documents which supported its right to summary judgment and asserted that: (1) the President of Industrial Ceramics, Lewis Miller ("Miller"), had testified under oath on December 17, 1998 at a Section 341 Meeting which was conducted after the Industrial Ceramics Chapter 11 case had been converted to a Chapter 7 case that Industrial Ceramics could not have paid all of its creditors, as their obligations became due in August 1995, November 1995 and at the time of the filing of its bankruptcy petition; (2) ABB had a

dual interest in Industrial Ceramics, an interest in having Industrial Ceramics continue to supply it with inventory at competitive prices and an interest in recouping the investment which it held in Industrial Ceramics in the form of the Preferred Stock and the Derry Mortgage; (3) ABB knew that Industrial Ceramics would not be viable without ABB as a customer; (4) prior to the Lapp Sale, ABB had written-down the Industrial Ceramics stock it held to $300,000.00; (5) ABB believed that the only way to realize more on its investment in Industrial Ceramics was to enter into a long-term supply agreement with it and Lapp which would provide for below market discounted prices for the goods purchased by ABB; (6) ABB knew that Jacobs, who was negotiating the agreements among Industrial Ceramics, ABB, Associates and Lapp, had serious conflicts of interests, including his personal liability on the Derry Mortgage which was in default, and it exploited those conflicts of interest; (7) ABB knew that the past due rent from Industrial Ceramics to Associates was less than the $315,600.00 provided for in the Forbearance Agreement; (8) ABB knew that the transactions among Industrial Ceramics, Associates and ABB were purposely structured in an attempt to negate any assertions that they were avoidable fraudulent or preferential transfers; (9) ABB, in connection with the transactions among Industrial Ceramics, Associates and ABB, intentionally failed to inquire into the financial condition of Industrial Ceramics in order to determine whether it was insolvent in either an equity or balance sheet sense; (10) Miller's intent with respect to the transactions involving Industrial Ceramics, Associates and ABB was to personally gain control of Industrial Ceramics and maximize his personal compensation and the return on his investment in Industrial Ceramics; and (11) Jacobs' intent with respect to the same transactions was to maximize the return of ABB and Associates in order to minimize his personal liability on the Derry Mortgage.

Associates interposed a Response to the Motion for Summary Judgment, together with an Affidavit by Jacobs, which asserted that: (1) even though some of the shareholders of Associates were shareholders of Industrial Ceramics, because the Committee had not demonstrated, nor could it demonstrate, that Associates either had the ability to or in fact had exercised the required degree of control or influence over Industrial Ceramics, in general or in connection with the transactions at issue, the Court could not find that Associates was an insider within the meaning and intent of Section 101(31) and Section 547(b)(4)(B); (2) because Associates was not an insider, the transfers to it from Industrial Ceramics, which occurred more than ninety days before the filing of its bankruptcy petition, were not avoidable preferential transfers; (3) Industrial Ceramics was not insolvent in either a balance sheet or equitable sense at the time the transfers at issue were made to Associates, nor was Industrial Ceramics rendered insolvent in either sense as the result of the transfers;[4] (4) because Industrial Ceramics was not insolvent, the Court could not find that the transfers

---

4. Section 101(32) of the Bankruptcy Code provides that insolvent means—
    (A) with reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—
    (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and
    (ii) property that may be exempted from property of the estate under section 522 of this title[.]

11 U.S.C. § 101(32) (2000).
    Section 271 of the NYDCL provides that a person is insolvent when the present fair saleable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.
    As set forth in footnote 2., Section 102(8) of the BCL provides that insolvent means being unable to pay debts as they become due in the usual course of the debtor's business.

from it to Associates were avoidable as constructive fraudulent transfers under either the Bankruptcy Code or the NYDCL, or as being in violation of the provisions of the BCL to the extent that, since the amounts transferred to Associates were directly paid to ABB, the Committee has asserted that the transfers were really direct transfers to ABB as additional consideration for the Preferred Stock; and (5) because: (a) neither Associates nor ABB ever had any fraudulent intent; (b) all of the transactions at issue were financially sound from the perspective of Industrial Ceramics; and (c) all of the transactions were negotiated at arms length by Miller, the transfers to Associates and ABB were not avoidable as transfers made with an actual intent to hinder and delay creditors under either the Bankruptcy Code or the NYDCL.

ABB also interposed Opposition to the Motion for Summary Judgment which: (1) made the same assertions as Associates with respect to solvency and fraudulent intent; (2) as defenses to the Committee's cause of action pursuant to BCL § 513, asserted that: (a) the Section does not apply when the redemption of stock is paid for with assets which would not otherwise be available for creditors; and (b) since the Lapp Sale could not have taken place but for ABB's approval and willingness to enter into a supply agreement, any consideration received by ABB for the redemption of the Preferred Stock would not be avoidable; (3) as a defense to the Committee's cause of action pursuant to Section 548(a)(1)(B), which asserted that the redemption by ABB of the Preferred Stock was avoidable as a constructive fraudulent conveyance, because Industrial Ceramics received reasonably equivalent value for any consideration it transferred in connection with the redemption, once again the consideration being in the nature of the supply agreement and the approval of the Lapp Sale, the transfers were not avoid-

able; and (4) ABB at all times acted in good faith as required by the NYDCL.

### *DISCUSSION*

I  *Summary of Decision*

Because I believe that the interests of justice would be best served by a trial on certain issues, and that there are material issues of fact with respect to: (1) balance sheet insolvency; (2) fraudulent intent on the part of Industrial Ceramics, ABB and Associates; (3) whether Associates was an insider for purposes of Section 547; (4) whether sufficient facts and circumstances exist for the Court to exercise its discretion pursuant to Section 510 to subordinate certain claims of Associates and ABB; and (5) whether any offset by ABB may have been an avoidable preferential transfer[5], the Motion for Summary Judgment is in all respects denied as to each of the causes of action contained in the Committee's Complaint with the exception of the First Cause of Action pursuant to BCL § 513.

Because there does not appear to be any genuine issue of fact or dispute that Industrial Ceramics was equitably insolvent at the time of the closing of the Lapp Sale and when the Preferred Stock was redeemed, any and all consideration received in exchange for the redemption is avoidable and recoverable. That includes the $25,000.00 actually received by ABB, any receipts on the Deferred Payment Component and any and all other consideration that the Court may determine after trial was paid by Industrial Ceramics to Associates and then received by ABB from Associates indirectly, but as further consideration for the redemption of the Preferred Stock.

II  *Summary Judgment*

Under Federal Rule of Civil Procedure 56(c), judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file,

---

**5.** The causes of action for subordination and the avoidance of an alleged offset, items (4) and (5), were not included in the Committee's Motion for Summary Judgment.

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The Rule is clear in "provid[ing] that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Repp v. Webber*, 132 F.3d 882 (2nd Cir.1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (further citations omitted)).

Further, as a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party. *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2nd Cir.1988) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (further citations omitted)). However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Repp v. Webber*, 132 F.3d at 889 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (further citations omitted)).[6]

The duty of a Court on a motion for summary judgment is to determine whether there are any genuine issues of material fact to be resolved by trial, and not to decide factual issues. As the Second Circuit has aptly stated: "In this regard, the Court's task is issue identification, not issue resolution. In performing this task, we must assume the truth of the non-movant's evidence." *Repp v. Webber*, 132 F.3d at 890; see also *Anderson v. Liberty Lobby Inc.*, 477 U.S. at 249, 106 S.Ct. 2505.

## III  *Overview*

■ Although the Committee in its Motion for Summary Judgment has provided the Court with numerous documents and extensive arguments[7], I believe that it simply has not sufficiently connected all of the dots on its causes of action, other than its cause of action pursuant to BCL § 513, so that the Court can grant Summary Judgment.

■ The Committee has urged the Court to utilize the internally prepared December 31, 1995 financials and then apply the theory of "Retrojection" to make a finding that Industrial Ceramics was insolvent in the balance sheet sense at the time of the closing of the Lapp Sale and the redemption of the Preferred Stock on November 10, 1999. Although the December 31, 1995 financials further support a finding of equitable insolvency, because of: (1) the large depreciation number set forth on the balance sheet; (2) the fact that the purchase price for the assets sold to Lapp was significantly higher than the book value of the assets; and (3) the concerns raised in the May 27, 1999 report prepared by Nihill & Riedley, P.C., Ricardo J. Zayas, C.P.A., (the "Zayas Report"), the Court is not prepared to make a finding of balance sheet insolvency without expert testimony.

The Committee has also urged the Court to find that Industrial Ceramics made the transfers in question with intent to hinder, delay and defraud its creditors, other than Associates. In connection with this request, the Zayas Report sets forth an analysis which suggests that, given the manner in which Industrial Ceramics had always operated, its use of the proceeds of the Lapp Sale was in its ordinary course of business, which was never in the best interests of its creditors.

---

**6.** This Court is mindful that factual materiality is governed by reference to the applicable substantive law. *Repp v. Webber*, 132 F.3d at 890.

**7.** The Court has spent a substantial amount of time reviewing the voluminous submissions of the parties in connection with the Motion for Summary Judgment.

In connection with the issue of whether Associates was an insider of Industrial Ceramics for purposes of Section 547, the Jacobs Affidavit raises legitimate questions as to the nature and extent of any "control" that Associates may have actually had or exercised with respect to Industrial Ceramics and specifically the transactions in question.

On the other hand, the defendants, Associates and ABB, have, at all stages of the Adversary Proceeding, including at the pretrials conducted by the Court, failed to in any way explain several important matters, including: (1) any actual economic and business basis which would justify Industrial Ceramics, in its then financial condition, paying a $300,000.00 lease extension fee in connection with the Derry Facility where it was no longer going to operate; (2) why, in connection with the Lapp Sale, Industrial Ceramics paid Associates, as the landlord of the Derry Facility where it was no longer going to operate, an additional $375,000.00 beyond the lease extension fee at the expense of its other creditors[8]; (3) why ABB believes that entering into a supply agreement with Industrial Ceramics and Lapp, which it required for its own business purposes, and approving the Lapp Sale, when it would have been unreasonable and not in its own economic best interests to have withheld the approval, somehow constituted separate and valuable consideration for the redemption of the Preferred Stock; and (4) why ABB believed that the creditors of Industrial Ceramics were not entitled to the proceeds of the Lapp Sale over it as a shareholder?

## IV  BCL § 513

### A.  *Evidence of Equitable Insolvency*

■    In its Motion for Summary Judgment the Committee has produced evidence that Industrial Ceramics was insolvent or rendered insolvent at the time of the Lapp Sale, as that term is defined in the BCL, which is an inability of an entity to pay its debts as they become due in the usual course of business. This is commonly referred to as Equitable Insolvency. *See Vowteras v. Argo Compressor Service Corp.*, 83 A.D.2d 834, 441 N.Y.S.2d 562 (2 Dept.), appeal denied 55 N.Y.2d 605, 447 N.Y.S.2d .1028, 432 N.E.2d 603 (1981). That evidence includes the following:

1.  LaSalle Memo dated July 21, 1995—"ICI has been receiving additional pressure from its suppliers since they heard about the Lapp transaction. Many of them think this signals the end of ICI ... This has created a tighter availability than ICI expected."

2.  Watch Asset Report dated November 30, 1995—"ICI is negotiating with former suppliers to the Derry plant. There is approximately $280,000 of payables owed to this group. ICI is offering $154,000 to discharge these debts or a multiple year payout."

3.  Watch Asset Report dated December 31, 1995—"ICI is negotiating with former vendors of the Derry plant. There is approximately $280,000 of payables owed to this group. ICI is offering 55% ($154,-000) to discharge these debts. To date, $115,000 of vendors have agreed to the payout."

4.  Watch Asset Report dated January 31, 1996—"November and December results were below forecast which caused ICI to use all of its excess availability. This raises concerns that the Company cannot withstand any minor problems which tend to be fairly common occurrences. Creditors appear to be becoming more restless as LBCI believes that they expected more trade debt reduction as a result of the sale of the Derry equipment than they have received."

---

**8.**  Industrial Ceramics paid the landlord 100% of all unpaid back rent as well as prepaid rent and then proceeded to attempt to discount its Derry-related trade payables.

5. LaSalle Memo dated January 10, 1996—"ICI requested that LBCI decrease or eliminate the delinquent real estate tax reserve of $134,000 to give the company to fund the payment of $53,000 of payables to the former Derry suppliers. ICI is attempting to repay these suppliers for 55% of face value. A list of the possible candidates are attached. LBCI gave a negative response to the situation."

6. Lewis Millers Section 341 testimony from December 17, 1998—

—"And here again I was, you can say as president, you should have been aware of all these things, but my problem is we were talking about surviving, and my survival mode was not to really take care of who owed what, when, at what point. My survival mode was in the manufacturing facility." p. 18 lines 12–17.

—"We were in distress for ten years." p. 29 lines 7–8.

—"Always fighting for survival. We had a period for five years where we made money every year, made out very well, not very well, but paid off loans and whatever. It was a very difficult time with the union in Derry, Pennsylvania." p. 31 lines 21–24.

—"Q. In August of 1995, would it be fair to say that I.C.I was in financial extremis"

—"A. Are you saying that they were in trouble?"

—"Q. I.C.I. was in financial extremis, and you were looking for money?

—A. Yes, the plant was closed, sure, we were losing money." p. 55 lines 14–18.

—"No, I think if I remember straight, I don't think in the ten years we ever paid our payables when they became due. We lived in constant not paying payables when they became due." p. 56 lines 21–23.

—"We never had any cash basically. I don't remember having any cash. We didn't have the luxury of having cash." p. 58 lines 5–6.

—"Q. So, Mr. Miller, in August of 1995, your company wasn't capable of paying trade payables as they came due, were they?

A. No, we never did." p. 63 lines 11–14.

—"We filed Chapter 11 because that we believed that we were going—That the bank had convinced me that we would have time to breathe so we could pay off every single dollar of those loans. That was our belief.

Q. Their loans?

A. Our loans, I.C.I. payables. We would be able to pay a hundred cents on the dollar." p. 69–70 lines 24–6.

—"Q. Were trade creditors threatening to sue you?

A. Every single day. The final step in April came when we put them off because we said we were going to have some money from this whole deal, and the time thing came about in April when the trade creditors—when one of the banks locked up our bank account and that's when we filed." p. 100 lines 18–23.

—"Q. And you are saying to me than on November 10, 1995, could your company have written a check to every one of those trade creditors to pay them off?

A. Absolutely not, you know that to be the truth. You know that. That's why if we were able to pay them off. I wouldn't be sitting here." p. 108 lines 20–25.

I believe that this constitutes sufficient evidence for the Court to make a finding that Industrial Ceramics was equitably insolvent for purposes of BCL § 513. Therefore, the Court must look to what evidence the defendants, Associates and ABB, have produced to raise a genuine

material issue of fact as to equitable insolvency. In this regard, ABB has interposed no evidence to indicate that Industrial Ceramics was not equitably insolvent, and has not even disputed that fact other than to state that it is not true.[9] Associates, on the other hand, at least attempted to address the issue of equitable insolvency in the Jacobs Affidavit. However, the Jacobs Affidavit states no more than that Industrial Ceramics always had financial problems so that the financial problems which existed when the Lapp Sale was negotiated and closed and the redemption of the Preferred Stock was effected were no different than before. This hardly raises a genuine issue of fact as to equitable insolvency. It does not even raise a "metaphysical doubt." In fact, what is most striking about the opposition of Associates and ABB is their inability to in any way create a genuine dispute as to equitable insolvency as I believe they have concerning balance sheet insolvency.

### B. *Recovery*

■ Since BCL § 513 clearly prohibits the redemption of stock, whether common or preferred, when a debtor such as Industrial Ceramics is, in an equitable sense, insolvent or will be rendered insolvent by the redemption, the amounts paid or to be paid to ABB in consideration of the redemption of the Preferred Stock are avoidable and recoverable. This includes the $25,000.00 cash proceeds received by ABB at the time of the closing of the Lapp Sale and any amounts that ABB may have received or may receive on the Deferred Payment Component.[10] Furthermore, I believe that some portion or all of the amounts paid to Associates, and thereafter immediately paid by Associates to ABB, may in fact have been additional consideration for the redemption of the Preferred Stock. However, I believe that this can be determined only after a trial when the Court has heard the testimony of witnesses who can provide further detail as to the basis for the allocation of the amounts ABB was to receive in connection with the Lapp Sale, which changed substantially from the initial proposal made by Miller in May 1995 to the time of the closing.

■ Courts have allowed trustees in bankruptcy to plead Section 544(b) to avoid a transfer under BCL § 513. If the trustee[11] was successful then the trustee could utilize Section 550[12] to recover directly from shareholders any consideration received in connection with a redemption which violated the provisions of BCL § 513. *See generally In Re Eljay Jrs., Inc.*, 106 B.R. 775 (Bankr.S.D.N.Y.1989).

■ Even though it may in part have been in the best interests of Industrial Ceramics, Westinghouse, a sophisticated

---

**9.** The Zayas Report talks around the issue but does not raise a genuine material issue of fact in my opinion.

**10.** Equitable Subordination under Section 510 provides an additional ground for avoidance and recovery of any amounts received on the Deferred Payment Component after the filing of the petition when Industrial Ceramics was clearly insolvent in both the balance sheet and equitable senses. *See In re Dino & Artie's Automatic Transmission Co., Inc.*, 68 B.R. 264 (Bankr.S.D.N.Y.1986).

**11.** In this case, because of the authority granted by the Court, the Committee is exercising the same rights as a trustee.

**12.** Section 550 provides that:
(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
(2) any immediate or mediate transferee of such initial transferee.
(b) The trustee may not recover under subsection (a)(2) of this section from—
(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt in good faith, and without knowledge of the voidability of the transfer avoided; or
(2) any immediate or mediate good faith transferee of such transferee.
11 U.S.C. §§ 550(a) and (b) (2000).

commercial entity, elected to convert its debt into preferred stock of a financially struggling New York corporation, and thus subject itself and any subsequent holder of the stock to the spirit, provisions and prohibitions of BCL § 513 should it attempt to recover on that investment through the redemption of the Preferred Stock. Both the Second Circuit and the New York Court of Appeals have made it clear that the capital of a corporation is held in trust for the benefit of creditors. *See Topken, Loring & Schwartz v. Schwartz*, 249 N.Y. 206, 163 N.E. 735 (N.Y.A.D.1928) ("but it has generally been held that no corporation can purchase its stock with its capital to the injury of its creditors. The capital of a corporation is held in trust for its creditors, so that any agreement to purchase stock from a stockholder, which may result in the impairment of capital, will not be enforced, or will be considered illegal if the rights of creditors are affected."); *In Re Fechheimer Fishel Co.*, 212 F. 357 (2nd Cir.1914) ("*** The capital stock 'of a corporation' is a fund set apart for the payment of its debts, and the directors *** hold it in trust for that purpose. *** The shareholders of the corporation are conclusively charged with notice of the trust character which attaches to its capital stock.")

■ Furthermore, to the extent that Section 550(b) provides an exception to recoverability for a good faith transferee without knowledge of the possible avoidability of the transfer, ABB clearly was aware of the possibility of the avoidability of the redemption of the Preferred Stock, so it cannot qualify as a good faith transferee for purposes of Section 550(b) with respect to the redemption. Documents 1–0717 and 1–0718 contained in the Committee's Supplement to Motion with Exhibits, makes it clear that ABB, as the successor to Westinghouse and the holder of the Preferred Stock, knew that a redemption of the Preferred Stock given the financial condition of Industrial Ceramics, might be problematic in view of BCL § 513.[13]

### C. *ABB's Affirmative Defense*

■ ABB has consistently and vigorously asserted as an affirmative defense to the Committee's Cause of Action pursuant to BCL § 513 that the creditors of Industrial Ceramics were never prejudiced by the amounts that ABB received for the redemption of the Preferred Stock, even if the consideration were ultimately found by the Court to include the entire $700,000.00 in cash which ABB received in connection with the Lapp Sale as well as the Deferred Payment Component. ABB argues that by entering into the supply agreement with Lapp and Industrial Ceramics and providing its approval of the Lapp Sale, it created additional value for the estate that was greater, in monies worth, than any amounts received by ABB in connection with the redemption of the Preferred Stock, or, in the alternative, that its actions created assets for the estate that would not otherwise have been available as property of the estate. Therefore, ABB asserts, there was a net benefit to the estate rather than a diminution of the estate. I reject this argument. Based upon the undisputed facts and circumstances presented in this case, I do not believe that: (1) providing an approval to the Lapp Sale where Lapp purchased the as-

---

**13.** *Dividends*

Payable only ". . . as and when declared by the Board of Directors . . ."
   Cumulative but not mandatory
   Must be paid only before declaring dividends on any stock ranking junior to the Series A Preferred Stock
Payable only ". . . out of funds . . . legally available therefor . . ."
   Payable out of surplus only (excess of net assets over stated capital)

May not be paid if corporation is insolvent (unable to pay debts as they become due in the usual course of business)
*Redemption*
   Mandatory but subject to legal restriction on use of funds (same as payment of dividends)
   Partial redemption may not be made unless full cumulative dividends are declared and paid upon all outstanding shares of Series A Preferred Stock
Document 1–0717

sets at a purchase price which all of the interested parties acknowledged was a fair price, so that for ABB, which had a representative on the Board of Directors at least through the period of the receipt of the initial offer through some of the negotiations regarding the ultimate distribution of the proceeds of the sale, to withhold its approval would have been exceptionally problematic; and (2) ABB entering into a supply agreement that all interested parties acknowledged was, at least in part, in the economic best interests of ABB, since it needed a supplier for at least some of the lines of insulators that Industrial Ceramics would provide from its small tube division and now Lapp would provide from the large tube division, constituted additional or new value in money or monies worth to the Industrial Ceramics estate which might result in this Court determining that the clear prohibition of BCL § 513 was inapplicable because creditors had not been prejudiced. In fact, the creditors of Industrial Ceramics were prejudiced by the consideration which flowed to ABB in connection with the redemption and certainly by some of the consideration which flowed to Associates.

V  *Motion to Amend the Committee's Complaint*

In the Wherefore Clause of the Motion for Summary Judgment, the Committee requests that the Court issue an order allowing it to amend its Complaint to include a cause of action to recover the sums obtained or saved by ABB as a result of or due to the supply agreement. However there does not appear to be any such request in the Notice of Motion, the Motion itself, or the Committee's Memorandums of Law. Therefore, the request to amend the Complaint is denied without prejudice.

### CONCLUSION

The Motion for Summary Judgment is denied in all respects except with respect to the Committee's Cause of Action pursuant to BCL § 513 as to which the Motion is granted. ABB shall turnover to the Committee, to be held by it in an interest-bearing bank account subject to further Court order, an amount equivalent to the $25,000.00 consideration which it received in connection with the redemption of the Preferred Stock, and any and all amounts that it has received on the Deferred Payment Component, if any. Furthermore, ABB shall immediately turnover to the Committee any amounts which it hereinafter receives on the Deferred Payment Component. After trial, the Court will determine whether any other amounts ultimately received by ABB in connection with the Lapp Sale constituted additional consideration for the redemption of the Preferred Stock.

This Adversary Proceeding will be called on the Court's May 17, 2000 Trial Calendar in order to schedule a date for trial.

**IT IS SO ORDERED.**