757 N.W.2d 194 (2008)
276 Neb. 686
STATE of Nebraska ex rel. L. Tim Wagner, Director of Insurance of the State of Nebraska, as Liquidator of Amwest Surety Insurance Company, appellee,
v.
GILBANE BUILDING COMPANY, a Rhode Island corporation, appellant.
No. S-07-805.
Supreme Court of Nebraska.
October 31, 2008.
*197 Robert F. Craig and Jenna B. Taub, of Robert F. Craig, P.C., Omaha, for appellant.
Michael S. Degan and Theresa D. Koller, of Blackwell Sanders, L.L.P., Omaha, and Robert L. Nefsky of Rembolt Ludtke, L.L.P., Lincoln, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
STEPHAN, J.
Amwest Surety Insurance Company (Amwest) was declared insolvent on June 7, 2001, and is the subject of a liquidation order entered pursuant to the Nebraska Insurers Supervision, Rehabilitation, and Liquidation Act (NISRLA).[1] The question presented in this appeal is whether the district court for Lancaster County erred in determining as a matter of law that four payments made by Amwest to Gilbane Building Company (Gilbane), the obligee on a performance bond, were preferences avoidable by the liquidator pursuant to § 44-4828. We affirm the judgment of the district court as to three of the payments. We reverse, and remand for further proceedings with respect to the remaining payment, which was made more than 4 months prior to the filing of the petition for liquidation, because there is a *198 genuine issue of material fact as to whether Amwest was insolvent at the time of the payment.

BACKGROUND
In 1997, Gilbane entered into a subcontract with Crane Plumbing & Heating Co., Inc. (Crane), under which Crane was to perform plumbing work on a construction project in Cambridge, Massachusetts. Pursuant to the subcontract, Crane obtained a "Labor and Material Payment Bond" and a "Performance Bond." Both bonds were issued by Amwest, as surety, on or about December 17, 1997. Gilbane was named as the obligee on each bond.
In January 2000, Crane abandoned the project and defaulted on its subcontract. Gilbane notified Amwest of the default and demanded that it complete Crane's portion of the project pursuant to the performance bond. Amwest subsequently made payments to Gilbane for costs associated with completion of Crane's contractual obligations. The first payment was made on January 5, 2001, when Amwest issued a check in the amount of $357,779.69 to Gilbane. Gilbane deposited the check on January 12. The second payment, a check in the amount of $26,150.23, was issued by Amwest to Gilbane on April 9 and deposited in Gilbane's account on or about April 10. The third payment, a check in the amount of $215,292.12, was issued by Amwest to Gilbane on April 13 and deposited in Gilbane's account on April 17. The final payment, a check in the amount of $4,222.04, was issued by Amwest on May 21 and deposited in Gilbane's account on May 24.
Amwest obtained a replacement subcontract for completion of the project. On March 28, 2001, Amwest and Gilbane entered into a release of the performance bond relating to the original subcontract with Crane, but not related to the replacement subcontract.
A petition to place Amwest in liquidation was filed on June 6, 2001, and Amwest was declared insolvent in an order entered on the following day. Subsequently, the Nebraska Director of Insurance, in his capacity as liquidator, filed a complaint alleging that the four payments made by Amwest to Gilbane in 2001 were preferential transfers voidable under § 44-4828 and seeking recovery in a total amount of $603,444.08 from Gilbane. Gilbane filed an answer denying the claims and setting forth several affirmative defenses. The parties filed cross-motions for summary judgment.
The district court entered summary judgment in favor of the liquidator and overruled Gilbane's motion. The court determined that the second, third, and fourth payments from Amwest to Gilbane were made within 4 months before the filing of the petition for liquidation and were therefore voidable as preferences.[2] The court further determined that there was no issue of material fact as to the insolvency of Amwest at the time of the first payment in January 2001. The court determined that all four payments were made by Amwest to Gilbane on account of an antecedent debt and that such payments allowed Gilbane to obtain a greater percentage of such debt than another creditor in the same class would receive. The court rejected Gilbane's contention that it was a mere conduit for another party and not an actual creditor responsible for a voidable preference. The district court also rejected Gilbane's contention that the transfers were made for a current expense in the ordinary course of business and, thus, not in satisfaction of an antecedent debt. Based upon these findings, the district *199 court entered judgment in favor of the liquidator and against Gilbane in the amount of $603,444.08.
Gilbane filed this timely appeal, and we moved it to our docket on our own motion pursuant to our statutory authority to regulate the caseloads of the appellate courts of this state.[3]

ASSIGNMENTS OF ERROR
Quoted verbatim, Gilbane's brief assigns the following errors:
(1) The District Court erred in granting [the liquidator's] Motion for Summary Judgment because the [liquidator] failed to prove the statutory elements of a preference.
(2) The District Court erred in denying [Gilbane's] Motion for Partial Summary Judgment regarding affirmative defenses for preference actions.
(3) The District Court erred in overruling [Gilbane's] Motion for Summary Judgment.
The liquidator argues that these assignments are generalized and vague and should be disregarded by this court.

STANDARD OF REVIEW
Statutory interpretation presents a question of law, for which an appellate court has an obligation to reach an independent conclusion irrespective of the determination made by the court below.[4]
Summary judgment is proper when the pleadings and evidence admitted at the hearing disclose no genuine issue regarding any material fact or the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[5] In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence.[6]

ANALYSIS
As a threshold matter, we agree that Gilbane's assignments of error are broadly stated. A generalized and vague assignment of error that does not advise an appellate court of the issue submitted for decision will not be considered.[7] Accordingly, we consider the assignments of error only insofar as they are narrowed by the specific arguments asserted in Gilbane's brief.[8]

CONTROLLING PRINCIPLES
The issues presented in this appeal are governed by the provisions of NISRLA. NISRLA authorizes a liquidator to avoid certain transfers by the insolvent insurer, including those which constitute a preference.[9] A "preference" is defined by NISRLA as
a transfer of any of the property of an insurer to or for the benefit of a creditor, for or on account of an antecedent debt, made or suffered by the insurer within one year before the filing of a *200 successful petition for liquidation under the Nebraska Insurers Supervision, Rehabilitation, and Liquidation Act the effect of which transfer may be to enable the creditor to obtain a greater percentage of such debt than another creditor of the same class would receive.[10]
A preference may be avoided by the liquidator if the insurer was (1) insolvent at the time of the transfer; (2) the transfer was made within 4 months before the filing of the successful petition for liquidation; (3) the recipient or its agent had reasonable cause to believe the insurer was insolvent or was about to become insolvent at the time the transfer was made; or (4) the creditor receiving the transfer was a person with whom the insurer did not deal at arm's length, for example, an employee or attorney.[11] The term "[c]reditor" is defined by NISRLA as "a person having any claim, whether matured or unmatured, liquidated or unliqidated, secured or unsecured, or absolute, fixed, or contingent."[12] When a preference is voidable, the liquidator may recover the transferred property from the person who received it, subject to certain rights of bona fide purchasers.[13]

WAS GILBANE CREDITOR OF AMWEST?
Gilbane argues that the liquidator sued the wrong entity. It contends that it was not a creditor of Amwest potentially liable for a voidable preference, but was rather a "mere conduit" through which the payments made by Amwest passed en route to the owner of the construction project.[14] In rejecting this argument, the district court determined that Gilbane was the "general contractor on the project and, as such, was responsible to the owner for [its] completion." Gilbane describes its role in the project as a "construction manager" responsible for managing the project and administering payments on behalf of the owner and subcontractors.[15]
Whether Gilbane was the "general contractor" or "construction manager" does not matter. The relationship of the parties at the time of the transfers in question was defined by the performance bond, which stated that Crane as principal and Amwest as surety were "held and firmly bound unto GILBANE ... as Obligee" (emphasis supplied) in the amount of $2,120,000 "for the payment whereof Principal and Surety bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents." The bond further recites that Crane and Gilbane had entered into a contract for certain construction work on the Cambridge project and that the bond was given to secure performance of Crane's contractual obligations to Gilbane.
Suretyship is a contractual relation resulting from an agreement whereby one person, the surety, engages to be answerable for the debt, default, or miscarriage of another, the principal.[16] A surety on a performance bond is bound in the manner and to the extent provided in the obligation.[17] The performance bond at issue in this case bound Amwest to fulfill Crane's contractual obligations to Gilbane *201 in the event of Crane's default. When Crane defaulted, Gilbane asserted a claim that Amwest fulfill its obligations under the bond, and Amwest made payments directly to Gilbane pursuant to that obligation. Amwest and Gilbane were the only parties to the agreement to release of the performance bond.
These facts are clearly distinguishable from In re FSC Corp.,[18] the bankruptcy case upon which Gilbane relies. In that case, a corporation entered into an indenture agreement with a bank which was designated as the indenture trustee. The agreement was intended to facilitate a series of loans to the corporation made by investors who held debentures. The indenture agreement provided that the corporation would send semiannual interest payments to the bank for transmittal to debenture holders. While insolvent, and within 90 days prior to filing its petition in bankruptcy, the corporation made an interest payment to the bank, which transmitted the funds to debenture holders pursuant to the indenture agreement. The bankruptcy court held that while the corporation's transfer constituted a preference, the bank had no liability because it acted solely as the agent for its principals, the debenture holders.
In this case, Gilbane was the sole obligee named in the performance bond. It was not identified as an agent for a disclosed principal, as it now contends. The fact that Gilbane used the funds it received from Amwest to pay a replacement subcontractor demonstrates that the transfers were both to and for the benefit of Gilbane, in that they permitted the completion of Crane's original contractual obligation to Gilbane. There is no merit to Gilbane's argument that it was a "mere conduit" of the funds it received from Amwest.

CAN PAYMENTS MADE IN ORDINARY COURSE OF BUSINESS CONSTITUTE VOIDABLE PREFERENCES UNDER NISRLA?
Gilbane argues that because Amwest made the payments at issue in the ordinary course of its business as a surety, the payments cannot constitute voidable preferences. The federal Bankruptcy Code in effect in 2001 specifically provided that to the extent that a transfer was in payment of a debt incurred by the debtor "in the ordinary course of business or financial affairs of the debtor and the transferee" and the transfer was "made in the ordinary course of business or financial affairs of the debtor and the transferee" or "made according to ordinary business terms," it could not be avoided as a preference.[19] Although NISRLA contains no similar provision, Gilbane invites us to read an "ordinary course of business" exception into the statute, following the lead of an Ohio appellate court in an unpublished opinion.[20]
We decline the invitation. As we noted at the outset, the law applicable to this case is statutory. It is the Legislature's function through the enactment of statutes to declare what is the law and public policy.[21] The Legislature is presumed to know the general condition surrounding the subject matter of the legislative enactment, and it is presumed to know and contemplate the legal effect that accompanies *202 the language it employs to make effective the legislation.[22] As we have long held:
A statute is not to be read as if open to construction as a matter of course. Where the words of a statute are plain, direct, and unambiguous, no interpretation is needed to ascertain the meaning. In the absence of anything to indicate the contrary, words must be given their ordinary meaning. It is not within the province of a court to read a meaning into a statute that is not warranted by the legislative language.[23]
Where the Legislature does not enact an exception to a statutory rule, this court "must assume that the Legislature intended to do what it did."[24]
The ordinary course of business exception was codified in the federal Bankruptcy Code before the Nebraska Legislature enacted NISRLA in 1989.[25] Although the Legislature specifically exempted certain transfers from being considered as avoidable preferences,[26] it did not enact an ordinary course of business exception. As noted, it is not our function to create exceptions to statutory rules.[27] We agree with the district court that Amwest's obligation to Gilbane under the performance bond at the time of the principal's default was an "antecedent debt" for which the four challenged payments were made.

DO "NET RESULT RULE" AND § 44-4828(9) APPLY?
Gilbane argues that the district court erred in not applying the "net result rule," a principle once applied under the federal Bankruptcy Act of 1898 to claims for balances due on an open account.[28] The majority of courts have held that the net result rule is no longer viable, given subsequent amendments to the 1898 act.[29] More importantly, the net result rule is not included in NISRLA, so we need not discuss it further.
Gilbane makes a related argument that the district court erred in not applying § 44-4828(9), which provides:
If a creditor has been preferred and afterward in good faith gives the insurer further credit without security of any kind for property which becomes a part of the insurer's estate, the amount of the new credit remaining unpaid at the time of the petition may be set off against the preference which would otherwise be recoverable from him or her.
Gilbane's brief lacks any clear explanation of how this defense applies in this case, *203 and we perceive none. Gilbane did not advance credit to Amwest, and there is no claim of setoff. Section 44-4828(9) does not apply to this case.

WAS AMWEST INSOLVENT AT TIME OF TRANSFERS TO GILBANE?
The second, third, and fourth transfers from Amwest to Gilbane occurred within the 4-month period before Amwest filed its petition under NISRLA. Under § 44-4828(1)(b)(ii), the liquidator could avoid these transfers without proving that Amwest was insolvent at the time of the transfer. We conclude that the district court did not err in granting the liquidator's motion for summary judgment as to these transfers, totaling $245,664.39.
The transfer in January 2001 is more problematic. Because it occurred outside the 4-month period, the liquidator alleged and was obligated under § 44-4828(1)(b)(i) to prove that Amwest was insolvent at the time of the transfer. An insurer is considered "insolvent" under NISRLA if it is "unable to pay its obligations when they are due or when its admitted assets do not exceed its liabilities plus the greater of: (i) Any capital and surplus required by law to be maintained; or (ii) The total par or stated value of its authorized and issued capital stock."[30] As the party moving for summary judgment, the liquidator had the initial burden to show that there was no genuine issue of material fact and that it was entitled to judgment as a matter of law.[31] Thus, the liquidator was required to produce evidence which, if uncontroverted, would establish that Amwest was insolvent at the time of the January 2001 payment to Gilbane.
In preference cases arising under federal bankruptcy law, courts have held that the testimony of an accountant or other financial expert is generally necessary to prove insolvency at the time of a challenged transfer.[32] Michael James Fitzgibbons, an accountant who served as special deputy receiver for Amwest, testified that Joseph J. DeVito was retained to review certain financial records which Fitzgibbons and others under his supervision had prepared to show the financial condition of Amwest as of June 30, 2000, and to determine whether Amwest was insolvent as of that date. Fitzgibbons acknowledged that he had not made any determination that Amwest was insolvent as of January 5, 2001, the date of the initial transfer to Gilbane, but, rather, drew the conclusion that Amwest was continually insolvent after June 30, 2000. The record includes reports purportedly authored by DeVito, one dated February 28, 2006, and the second dated June 28, 2006. Both reports are attached to the affidavit of an attorney representing the liquidator, which merely indicates that the reports are true and correct copies. The reports set forth DeVito's opinion regarding the insolvency of Amwest as of June 30, 2000, and subsequent to that date. Gilbane objected to "the relevancy, materiality and competency" of the DeVito reports. The district court took the objection under advisement and overruled it in its final order. For the sake of completeness, we note that while Gilbane's counsel stated during a November 25, 2005, hearing that DeVito's *204 deposition was taken, the deposition is not included in our record.
Although Gilbane did not assign error with respect to the court's ruling on its objections to the DeVito reports, it argues on appeal that the reports do not support the liquidator's contention that Amwest was insolvent as of the January 2001 payment to Gilbane. We agree, although for a different, more basic reason than that advanced by Gilbane. Neb.Rev. Stat. § 25-1332 (Cum. Supp. 2006) provides that the "evidence that may be received on a motion for summary judgment includes . . . affidavits." Such affidavits, however,
shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.[33]
The affidavit of counsel identifying the attached "true and correct" copies of DeVito's reports does not convert such reports into affidavits. The reports themselves are not sworn and do not meet the statutory definition of an affidavit.[34] Unsworn summaries of facts or arguments and of statements which would be inadmissible in evidence are of no effect in a motion for summary judgment.[35] Accordingly, we do not consider the DeVito reports on the question of whether Amwest's insolvency at the time of the first transfer was established as a matter of law.
This leaves only the "conclusion" drawn by Fitzgibbons from "operational results of Amwest . . . subsequent to June 30th of 2000" that Amwest was insolvent at all times subsequent to that date. The record does not reflect whether or not Fitzgibbons was "qualified as an expert by knowledge, skill, experience, training, or education"[36] to make this determination, or the methodology he utilized in doing so. Fitzgibbons' testimony is insufficient to meet the liquidator's prima facie burden on the issue of insolvency.
As a procedural equivalent to a trial, a summary judgment is an extreme remedy because a summary judgment may dispose of a crucial question in litigation, or the litigation itself, and may thereby deny a trial to the party against whom the motion for summary judgment is directed.[37] On this record, we simply cannot conclude as a matter of law that Amwest was insolvent within the meaning of NISRLA at the time of its initial payment to Gilbane in January 2001.

CONCLUSION
The district court correctly determined that the liquidator was entitled to summary judgment with respect to its claims that the three payments made by Amwest to Gilbane within 4 months prior to the filing of Amwest's petition for liquidation were voidable preferences for which Gilbane is liable to the liquidator. However, for the reasons discussed, we conclude that *205 the district court erred in granting summary judgment with respect to the initial payment made in January 2001, more than 4 months before the filing of the petition. On that issue, we reverse, and remand for further proceedings consistent with this opinion.
AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.
NOTES
[1] Neb.Rev.Stat. §§ 44-4801 to 44-4862 (Reissue 1998).
[2] See § 44-4828(1)(b)(ii).
[3] See Neb.Rev.Stat. § 24-1106(3) (Reissue 1995).
[4] State v. Hense, 276 Neb. 313, 753 N.W.2d 832 (2008); State v. Rodriguez-Torres, 275 Neb. 363, 746 N.W.2d 686 (2008).
[5] Marcovitz v. Rogers, 276 Neb. 199, 752 N.W.2d 605 (2008); County of Hitchcock v. Barger, 275 Neb. 872, 750 N.W.2d 357 (2008).
[6] Id.
[7] Trieweiler v. Sears, 268 Neb. 952, 689 N.W.2d 807 (2004); Miller v. City of Omaha, 253 Neb. 798, 573 N.W.2d 121 (1998).
[8] See Trieweiler v. Sears, supra note 7.
[9] §§ 44-4821(u) and 44-4828(b).
[10] § 44-4828(1)(a).
[11] § 44-4828(b)(i) to (iv).
[12] § 44-4803(2).
[13] § 44-4828(1)(c).
[14] Brief for appellant at 9.
[15] Id.
[16] See, Rodehorst v. Gartner, 266 Neb. 842, 669 N.W.2d 679 (2003); Sawyer v. State Surety Co., 251 Neb. 440, 558 N.W.2d 43 (1997).
[17] See School Dist. No. 65R v. Universal Surety Co., 178 Neb. 746, 135 N.W.2d 232 (1965).
[18] In re FSC Corp., 64 B.R. 770 (Bkrtcy. W.D.Pa.1986).
[19] 11 U.S.C. § 547(c)(2) (2000).
[20] Covington v. HKM Direct Market Communications, Inc., No. 03AP-52, 2003 WL 22784378 at *2 (Ohio App. Nov. 25, 2003) (unpublished opinion).
[21] Stewart v. Bennett, 273 Neb. 17, 727 N.W.2d 424 (2007).
[22] Id., citing Ludwig v. Board of County Commissioners, 170 Neb. 600, 103 N.W.2d 838 (1960).
[23] Bachus v. Swanson, 179 Neb. 1, 4, 136 N.W.2d 189, 192 (1965).
[24] Loewenstein v. Amateur Softball Assn., 227 Neb. 454, 458, 418 N.W.2d 231, 234 (1988).
[25] See, 11 U.S.C. § 547; §§ 44-4801 to 44-4862. See, also, In re Paris Industries Corp., 130 B.R. 1 (Bkrtcy.D.Me.1991); In re Cook United, Inc., 117 B.R. 884 (Bkrtcy.N.D.Ohio 1990).
[26] See § 44-4828(4) and (9).
[27] See, e.g., Stewart v. Bennett, supra note 21; Farber v. Lok-N-Logs, Inc., 270 Neb. 356, 701 N.W.2d 368 (2005); Loewenstein v. Amateur Softball Assn., supra note 24; Bachus v. Swanson, supra note 23.
[28] Brief for appellant at 16. See, Yaple v. Dahl-Millikan Grocery Co., 193 U.S. 526, 24 S.Ct. 552, 48 L.Ed. 776 (1904); Jaquith v. Alden, 189 U.S. 78, 23 S.Ct. 649, 47 L.Ed. 717 (1903).
[29] In re Frigitemp Corp., 753 F.2d 230 (2d Cir.1985); In re Wadsworth Bldg. Components, Inc., 711 F.2d 122 (9th Cir.1983); In re Fulghum Const. Corp., 706 F.2d 171 (6th Cir. 1983); In re Swallen's, Inc., 266 B.R. 807 (Bkrtcy.S.D.Ohio 2000).
[30] § 44-4803(14)(b).
[31] See, Hofferber v. City of Hastings, 275 Neb. 503, 747 N.W.2d 389 (2008); Malolepszy v. State, 273 Neb. 313, 729 N.W.2d 669 (2007); Lovette v. Stonebridge Life Ins. Co., 272 Neb. 1, 716 N.W.2d 743 (2006).
[32] See, In re Roblin Industries, Inc., 78 F.3d 30 (2d Cir.1996); In re Prime Realty, Inc., 380 B.R. 529 (8th Cir.BAP2007); In re Doctors Hosp. of Hyde Park, Inc., 360 B.R. 787 (Bkrtcy.N.D.Ill.2007); In re Indus. Ceramics, Inc., 253 B.R. 323 (Bkrtcy.W.D.N.Y.2000).
[33] Neb.Rev.Stat. § 25-1334 (Reissue 1995).
[34] Neb.Rev.Stat. § 25-1241 (Reissue 1995).
[35] Kulhanek v. Union Pacific RR., 8 Neb.App. 564, 598 N.W.2d 67 (1999). See White v. Ardan, Inc., 230 Neb. 11, 430 N.W.2d 27 (1988).
[36] See Neb.Rev.Stat. § 27-702 (Reissue 1995).
[37] Fossett v. Board of Regents, 258 Neb. 703, 605 N.W.2d 465 (2000); Bruning v. Law Offices of Ronald J. Palagi, 250 Neb. 677, 551 N.W.2d 266 (1996).