Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/28/2016 09:09 AM CDT

Randy Strode and Helen Strode, appellants, v.
City of Ashland, Nebraska, and Saunders
County, Nebraska, appellees.

___ N.W.2d ___

Filed October 28, 2016.    No. S-15-956.

1. **Judgments: Res Judicata: Collateral Estoppel: Appeal and Error.** The applicability of claim and issue preclusion is a question of law. On a question of law, an appellate court reaches a conclusion independent of the court below.

2. **Limitations of Actions: Appeal and Error.** The point at which a statute of limitations begins to run must be determined from the facts of each case, and the decision of the district court on the issue of the statute of limitations normally will not be set aside by an appellate court unless clearly wrong.

3. **Summary Judgment.** Summary judgment is proper when the pleadings and evidence admitted at the hearing disclose no genuine issue regarding any material fact or the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.

4. **Summary Judgment: Appeal and Error.** In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence.

5. **Limitations of Actions: Pleadings: Proof.** Where a complaint does not disclose on its face that it is barred by the statute of limitations, a defendant must plead the statute as an affirmative defense and, in that event, the defendant has the burden to prove that defense.

6. **Limitations of Actions: Damages.** An action accrues and the statutory time within which the action must be filed begins to run when the injured party has the right to institute and maintain a lawsuit, although the party may not know the nature and extent of the damages.

7. **Limitations of Actions.** An aggrieved party has the right to institute and maintain a lawsuit upon the violation of a legal right.

8. **Limitations of Actions: Eminent Domain.** In the context of a physical taking, the statutory period starts running only when a party exercises dominion over or obtains an interest in the property.

9. **Limitations of Actions: Municipal Corporations: Eminent Domain.** In the context of a regulatory taking, a cause of action for inverse condemnation begins to accrue when the injured party has the right to institute and maintain a lawsuit due to a city's infringement, or an attempt at infringement, of a landowner's legal rights in the property.

10. **Constitutional Law: Eminent Domain: Limitations of Actions.** Actions commenced under Neb. Const. art. I, § 21, are subject to a 10-year statute of limitations.

11. **Constitutional Law: Eminent Domain: Damages.** Neb. Const. art. I, § 21, provides that the property of no person shall be taken or damaged for public use without just compensation therefor.

12. **Constitutional Law: Eminent Domain.** Federal constitutional case law and Nebraska constitutional case law regarding regulatory takings are coterminous.

13. **Eminent Domain.** The U.S. Supreme Court has identified two types of regulatory actions that constitute categorical or per se takings: (1) where the government requires an owner to suffer a permanent physical invasion of his property, however minor, and (2) where regulations completely deprive an owner of all economically beneficial use of his property.

14. ____. Regulatory takings challenges are analyzed using essentially ad hoc, factual inquiries governed by factors which include the economic impact of the regulation on the claimant, the extent to which the regulation has interfered with distinct investment-backed expectations, and the character of the governmental action.

15. ____. Land use regulations do not effect a taking merely because the regulation caused a diminution in property value.

16. ____. A taking may more readily be found when the interference with property can be characterized as a physical invasion by government, in contrast to when the interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.

17. **Actions: Eminent Domain: Proximate Cause: Proof.** For an inverse condemnation claim to be actionable, the injured party has the burden of proving that the other party's action or inaction was the proximate cause of the damages.

18. **Negligence: Proximate Cause: Words and Phrases.** The proximate cause of an injury is that which, in a natural and continuous sequence,

without any efficient intervening cause, produces the injury, and without which the injury would not have occurred.

Appeal from the District Court for Saunders County: Mary C. Gilbride, Judge. Affirmed.

Terry K. Barber, of Barber & Barber, P.C., L.L.O., for appellants.

Mark A. Fahleson and Sheila A. Bentzen, of Rembolt Ludtke, L.L.P., for appellee City of Ashland.

Duke Drouillard and Steven J. Twohig, Deputy Saunders County Attorneys, for appellee Saunders County.

Heavican, C.J., Wright, Miller-Lerman, Cassel, Stacy, Kelch, and Funke, JJ.

Heavican, C.J.

## I. INTRODUCTION

Randy Strode and Helen Strode seek review of the district court's decision dismissing Randy's zoning regulation inverse condemnation claim, granting a motion for summary judgment on Helen's zoning regulation inverse condemnation claim, and granting a motion for summary judgment on the Strodes' takings claim based on the load limit posted on a bridge located near their property. We affirm.

First, we hold that Randy is barred from bringing his inverse condemnation claim, because the statute of limitations on his claim for compensation began to accrue at the time the City of Ashland (the City) notified Randy that the use of the property was in violation of the ordinance. Next, we turn to Helen's claim. We similarly dispose of that claim based on the statute of limitations, because, as a joint owner, she has the same rights in the property as Randy. Finally, we hold that summary judgment was appropriate on the Strodes' bridge takings claim, because the load limit on the bridge does not amount to

a regulatory taking of the property and there are no issues of material fact.

## II. BACKGROUND

Randy and Helen are residents of Saunders County, Nebraska. They are married.

### 1. ZONING VIOLATION

Randy owns real property on Block 16, Lots 1, 2, and 3, and Randy and Helen jointly own real property on Block 16, Lots 7 through 12, and Block 21, Lots 10 and 11, of Stambaugh's Addition, in Ashland, Saunders County, Nebraska. On April 29, 1999, Randy purchased Lots 1, 2, and 3 of Block 16 from Greenwood Farmers Cooperative. On November 2, 2000, Randy and Helen purchased Lots 10, 11, and 12 of Block 16 from Donald D. Strode and Lucille D. Strode. On December 20, 2001, Randy and Helen purchased Lots 7, 8, and 9 of Block 16 from Donald and Lucille. On April 18, 2002, Randy and Helen purchased Lots 10 and 11 of Block 21 from David L. Hancock. The property was zoned Public (PUB) by ordinance No. 808, passed and approved on March 5, 1998, prior to the Strodes' purchase of the property. The ordinance provides in pertinent part:

**ARTICLE 2: DEFINITIONS**

. . . .

**Section 2.02 Definitions.**

. . . .

**Non-conforming Use** is an existing use of a structure or land which does not comply in some respect with the use regulations applicable to new uses in the zoning district in which it is located.

. . . .

**Variance** A variance is a relaxation of the terms of the Zoning Ordinance where such variance will not be contrary to the public interest and where, owing to conditions peculiar to the property and not the result of the actions of the applicant, a literal enforcement of the

Ordinance would result in unnecessary and undue hardship. As used in this Ordinance, a variance is authorized only for height, area, and size of structure or size of yards and open spaces; establishment or expansion of a use otherwise prohibited shall not be allowed by variance, nor shall a variance be granted because of the presence of non-conformities in the zoning district or uses in an adjoining district.

. . . .

## ARTICLE 4: GENERAL PROVISIONS

. . . .

### Section 4.20 Nonconforming Uses.

1. *Nonconforming Uses of Land:* Where at the effective date of adoption or amendment of this ordinance, lawful use of land exists that is made no longer permissible under the terms of this ordinance as enacted or amended, such use may be continued so long as it remains otherwise lawful, subject to the following provisions:

a. No such conforming use shall be enlarged or increased, nor extended to occupy a greater area of land than was occupied at the effective date of adoption or amendment [of] this ordinance;

b. No such nonconforming use shall be moved in whole or in part to any other portion of the lot or parcel occupied by such use at the effective date of adoption or amendment of this ordinance.

c. If any such nonconforming use of land ceases for any reason for a period of more than twelve (12) months, any subsequent use of such land shall conform to the regulations specified by this ordinance for the district in which such land is located.

. . . .

## ARTICLE 5: ZONING DISTRICTS

. . . .

### Section 5.15 PUB Public and Semi-Public Districts

1. Intent. The Public and Semi-Public District designates those areas reserved for public use and recreation.

2. Permitted Uses

a. Recreational uses including the following: parks, ball fields, swimming pools, soccer fields, trails, and associated uses.

b. Other public uses including: cemeteries and fairgrounds.

3. Permitted Special uses (reserved)

4. Accessory Uses

Since the time of purchase, the Strodes have operated a business for the manufacture of agricultural fencing and the storage of salvage on the property. Between November 2002 and June 10, 2003, the City zoning administrator repeatedly notified Randy that his use of the property was in violation of the City's code and regulations and requested Randy to remedy his violations. Initially, Helen contended that she did not become aware of the zoning violation until Randy mentioned it to her in June 2002, but later testified that she was unaware of the violation notices until May or June of 2003.

2. CITY'S 2003 REQUEST FOR INJUNCTION

The City filed for an injunction against Randy's nonconforming use of the property on September 5, 2003. Randy alleged in his amended answer that the zoning regulations were ineffective and void because they amounted to a taking of the property without just compensation. In his prayer for relief, Randy asked only that the City's complaint be dismissed at the City's costs. He did not set forth a counterclaim for inverse condemnation.

The district court held that Randy's use of the property to store salvage was in violation of the zoning ordinance and granted the City's request for an injunction. The district court also found that the manufacture of agricultural fencing on Block 16, Lots 7 through 12, was permitted as a continuing, nonconforming use.

Randy appealed from the award of the injunction. On appeal, Randy argued that the regulations amounted to a taking without just compensation. The Nebraska Court of

Appeals affirmed the district court's decision and found Randy's arguments concerning inverse condemnation to be without merit. The Court of Appeals noted that its review was "confined to questions which had been determined by the trial court," and thus it could not address the claim.[1] However, the Court of Appeals did observe that there was "nothing in the record to show the [inverse condemnation] claim would be ripe for review."[2]

### 3. 2004 BRIDGE LOAD LIMIT VIOLATION

The property may be reached by two access points: (1) a railroad underpass and (2) a bridge located inside the corporate limits of the City with a posted load limit of 14 tons.

The Strodes use the bridge for transporting commercial goods with semitrailer trucks that exceed the load limit. On June 23, 2004, the county highway superintendent mailed notice to Randy that his use of the bridge violated the posted weight limit.

### 4. 2013 SUIT FOR INVERSE CONDEMNATION

On September 5, 2013, Randy and Helen filed suit against the City, Saunders County (hereinafter the County), and the Nebraska Department of Roads for inverse condemnation based on the zoning ordinance and the load limit regulation of the bridge. The cause of action against the Department of Roads was dismissed, apparently because the bridge was not under the jurisdiction of the State. The district court held that Randy's zoning takings claim was barred by claim preclusion because it was a matter that was litigated in the 2003 case. The district court did not dismiss Helen's zoning takings claim because the record did not contain sufficient information from which the court could determine whether Helen's claim was precluded. The district court overruled the County's

---

[1] *City of Ashland v. Strode*, No. A-05-467, 2007 WL 1276944, *7 (Neb. App. May 1, 2007) (not designated for permanent publication).

[2] *Id.*

motion to dismiss the Strodes' takings claim in regard to the bridge load limit.

The district court subsequently held that Helen's zoning takings claim was barred by the statute of limitations because she was aware of the effect of the zoning ordinance after June 2003. The district court noted that the applicable statute of limitations was 10 years. As such, Helen's claim, which she discovered in June 2003, was barred as of June 2013, prior to her filing suit in September 2013. Finally, the district court dismissed the Strodes' bridge takings claim. The court held that the restrictions on the bridge did not amount to a taking, because there was reasonable access to the property via an underpass and the bridge—provided the restrictions are observed. The Strodes appeal.

## III. ASSIGNMENTS OF ERROR

On appeal, the Strodes assign, restated and consolidated, that the district court erred in (1) granting the City's motion to dismiss by determining Randy's claim was precluded by earlier litigation, (2) determining that Helen's regulatory takings claim was barred by the applicable statute of limitations, (3) finding that the regulation of the bridge structure was not a regulatory taking, and (4) granting the City's and the County's motions for summary judgment.

## IV. STANDARD OF REVIEW

[1] The applicability of claim and issue preclusion is a question of law. On a question of law, we reach a conclusion independent of the court below.[3]

[2] The point at which a statute of limitations begins to run must be determined from the facts of each case, and the decision of the district court on the issue of the statute of limitations normally will not be set aside by an appellate court unless clearly wrong.[4]

---

[3] *Hara v. Reichert*, 287 Neb. 577, 843 N.W.2d 812 (2014).

[4] *Manker v. Manker*, 263 Neb. 944, 644 N.W.2d 522 (2002).

[3,4] Summary judgment is proper when the pleadings and evidence admitted at the hearing disclose no genuine issue regarding any material fact or the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[5] In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence.[6]

## V. ANALYSIS

### 1. Randy's Takings Claim

In their first assignment of error, the Strodes argue that Randy's takings claim is not subject to claim preclusion because the issue was not ripe until the district court's decision in the 2003 case. The City argues that Randy's takings claim was ripe as early as the time Randy purchased the property and as late as June 10, 2003, because the permissible uses of the property were known to a reasonable degree of certainty. The district court dismissed Randy's takings claim because the issues were litigated in the 2003 case. Before discussing ripeness, we must determine whether Randy's takings claim is barred by the statute of limitations.

[5] The general rule is that where a complaint does not disclose on its face that it is barred by the statute of limitations, a defendant must plead the statute as an affirmative defense and, in that event, the defendant has the burden to prove that defense.[7] The Strodes' complaint did not disclose on its face that it was time barred by the statute of limitations. However, the City pleaded the statute of limitations as

---

[5] *State ex rel. Wagner v. Gilbane Bldg. Co.*, 276 Neb. 686, 757 N.W.2d 194 (2008).

[6] *Id.*

[7] *Lindner v. Kindig*, 285 Neb. 386, 826 N.W.2d 868 (2013).

an affirmative defense in its answer and argued at oral argument that the statute of limitations barred both of the Strodes' claims. Therefore, the statute of limitations has been raised as to both Randy's and Helen's takings claims.

[6,7] "The statute of limitations in an inverse condemnation proceeding is 10 years."[8] When applying a statute of limitations, we have held that "[a]n action accrues and the statutory time within which the action must be filed begins to run when the injured party has the right to institute and maintain a lawsuit, although the party may not know the nature and extent of the damages."[9] An aggrieved party has the right to institute and maintain a lawsuit "upon the violation of a legal right."[10]

We discussed the statute of limitations for an inverse condemnation action in the context of physical takings in *Western Fertilizer v. City of Alliance*.[11] In that case, BRG, Inc., purchased property from Western Fertilizer and Cordage Company, Inc. (Western) in 1976, planning to develop the land for residential use. BRG authorized the City of Alliance to improve the property, so in April 1977, the city passed two ordinances approving the plat of an addition that contained a dedication of the streets, alleys, and public grounds therein to the use and benefit of the public. In August, Western signed a dedication for part of the property. In October, BRG gave Western a promissory note secured by a mortgage on the property. Between November 1978 and October 1981, BRG signed more dedications and the city passed several

---

[8] *Western Fertilizer v. City of Alliance*, 244 Neb. 95, 108, 504 N.W.2d 808, 817 (1993) (citing Neb. Rev. Stat. § 25-202 (Reissue 1989)).

[9] *Steuben v. City of Lincoln*, 249 Neb. 270, 272-73, 543 N.W.2d 161, 163 (1996).

[10] *Reinke Mfg. Co. v. Hayes*, 256 Neb. 442, 452, 590 N.W.2d 380, 389 (1999).

[11] *Western Fertilizer v. City of Alliance, supra* note 8.

ordinances approving plats and establishing sewer, water, and street improvement districts in the property. In 1985, Western initiated foreclosure proceedings because BRG defaulted on the mortgage. In 1988, Western purchased the land at a sheriff's sale. In 1990, Western instituted an inverse condemnation action against the city.

[8] The city argued that the statute of limitations barred Western's action. According to the city, Western's cause of action accrued when the dedications were made and the ordinances were passed. We stated that Western received notice of the city's claim when the plats were recorded, but that the record did not reflect when that occurred. We cautioned, "[T]he fact that the [c]ity claimed an interest in the property may not be sufficient to start the statutory period running if the [c]ity did not put the property to public use."[12] We then determined that "the statutory period would have started running only when the [c]ity exercised dominion over or obtained an interest in the property."[13] But because the record was silent as to when the city began construction of the improvements pursuant to the ordinances or when the construction was completed, we could not determine when the city exercised physical control over the property. Ultimately, we concluded that the date of any taking was a factual question that needed to be determined by the trial court.

In *Steuben v. City of Lincoln*,[14] this court also addressed when the statutory period starts running for an inverse condemnation action in a physical taking. In 1986, Charles and Rebecca Steuben acquired property that was located on a plat adjacent to a railroad fill. The embankment for the railroad fill was "substantially higher than the Steubens' property, [and] block[ed] the natural drainage flowing northerly

---

[12] *Id.* at 111, 504 N.W.2d at 819.

[13] *Id*. at 112, 504 N.W.2d at 819.

[14] *Steuben v. City of Lincoln, supra* note 9.

behind the property."[15] Within the embankment were culverts through which surface water draining could pass. In 1990, rainfall caused the embankment to overflow into the Steubens' house due to a clogged culvert. The Steubens contended that the flooding of their house constituted a physical taking, and they filed an inverse condemnation claim against the city. While this court did not specify when the Steubens' inverse condemnation claim accrued, it set forth guidance for when an inverse condemnation claim for a physical taking generally accrues. This court stated that "[a]n action accrues and the statutory time within which the action must be filed begins to run when the injured party has the right to institute and maintain a lawsuit, although the party may not know the nature and extent of the damages."[16] Accordingly, "[t]he Steubens filed their claim well within 10 years of any event which would have given them the right to institute and maintain a lawsuit."[17]

This court has not specifically addressed when the statutory period starts running in an inverse condemnation action in the context of regulatory takings, but we find guidance in *Western Fertilizer*. There, we discussed a decision from the Iowa Supreme Court involving an inverse condemnation action brought following the enactment of restrictive zoning regulations.[18] We observed that the Iowa Supreme Court, in considering whether the statute of limitations barred the action, stated that "'the passage of the permanent ordinance had immediate adverse economic consequences for plaintiffs. The regulation's impact on the development potential and market value of the property was immediate, and constituted

---

[15] *Id.* at 271-72, 543 N.W.2d at 162.

[16] *Id.* at 272-73, 543 N.W.2d at 163.

[17] *Id*. at 273, 543 N.W.2d at 163.

[18] See *Western Fertilizer v. City of Alliance, supra* note 8.

a single injury.'"[19] We noted that under the facts of *Western Fertilizer*, "BRG's dedications and passage of the city ordinances had an immediate impact on Western's interest in the property."[20]

In *Lindner v. Kindig*,[21] this court considered a constitutional challenge to an ordinance establishing an off-street parking district and specifying funding mechanisms. Arguably, at least one funding mechanism was not challenged, and our principal difficulty in that case was determining, from the face of the complaint, "*when* appellees made the decision choosing the specific funding mechanism to be used or implemented that decision."[22] But *Lindner* was not an inverse condemnation case, and it addressed a different statute of limitations than the one which applies in this case.

We also look to other jurisdictions for guidance. Some jurisdictions have held that the statute of limitations on a regulatory takings claim begins to run when the petitioner has actual notice of the regulatory taking.[23] Other jurisdictions have determined that the statute of limitations begins to run when the petitioner has record notice.[24] Still other jurisdictions

---

[19] *Id*. at 110, 504 N.W.2d at 818 (quoting *Scott v. City of Sioux City*, 432 N.W.2d 144 (Iowa 1988)).

[20] *Id*. at 110, 504 N.W.2d at 818.

[21] *Lindner v. Kindig, supra* note 7.

[22] *Id*. at 393, 826 N.W.2d at 873 (emphasis in original).

[23] See, e.g., *Scott v. City of Sioux City, supra* note 19 (statute of limitations began to run no later than when plaintiffs filed action seeking recovery for inverse condemnation because it indicates they believed they had sustained injury at that time).

[24] See, e.g., *Klumpp v. Borough of Avalon*, 202 N.J. 390, 409-10, 997 A.2d 967, 978 (2010) ("[u]nder either principle for accomplishing the taking—physical or regulatory—following the governmental seizure of the property, the cause of action for inverse condemnation begins to accrue on 'the date the landowner becomes aware or, through the exercise of reasonable diligence, should have become aware, that he or she had been deprived of all reasonably beneficial use'").

have held that the statute of limitations begins to run when the land use regulation is passed, because that provides sufficient notice to landowners.[25]

[9] We now hold that in the context of a regulatory taking, a cause of action for inverse condemnation begins to accrue when the injured party has the right to institute and maintain a lawsuit due to a city's infringement, or an attempt at infringement, of a landowner's legal rights in the property. This is consistent with our holding in *Western Fertilizer* in regard to inverse condemnation actions in the context of physical takings requiring more than a city's claiming an interest in the property; the city must exercise dominion over or obtain an interest in the property for the statutory period to start running.

In determining when a cause of action for inverse condemnation accrued in this case, the relevant inquiry is when the Strodes had the right to institute and maintain a lawsuit against the City for the infringement or attempt at infringement of the legal right to use the property as they wished, because the City exercised dominion over or obtained an interest in the property. The City passed the ordinance in 1998. As in *Western Fertilizer*, the passage of the ordinance indicated that the City claimed an interest in the property, but it was not sufficient to toll the statute of limitations. The City acted to implement the ordinance on the property (1) when the City zoning administrator repeatedly notified the Strodes of

---

[25] See, e.g., *Levald, Inc. v. City of Palm Desert*, 998 F.2d 680, 688 (9th Cir. 1993) ("cause of action under section 1983 accrued upon the passage of the ordinance"); *Fredrick v. Northern Palm Beach Cty. Imp.*, 971 So. 2d 974 (Fla. App. 2008) (statute of limitations began to accrue either from date assessments were created or from date city approved them, as this provided property owners with adequate notice); *Lowenberg v. City of Dallas*, 168 S.W.3d 800, 802 (Tex. 2005) ("[g]enerally, a cause of action accrues when a wrong produces an injury[, and in] a regulatory taking, it is passage of the ordinance that injures a property's value or usefulness").

their nonconforming use of the property between November 2002 and June 10, 2003, and (2) on June 10, 2003, when the City zoning administrator mailed Randy notice of his nonconforming use and the City's intention to institute legal action if the Strodes did not conform their use to the PUB designation of the property. At both of these times, the City's actions had an adverse economic impact on the Strodes' right to use the property in the commercial manner that they wished. This gave rise to the Strodes' right to institute and maintain a lawsuit against the City for its implementation of the ordinance upon the property. Therefore, at the latest, the City's June 10 letter to Randy stating its intent to institute legal proceedings against him began the running of the statute of limitations on the Strodes' claims. Randy filed his inverse condemnation claim on September 5, 2013. This exceeds the 10-year statute of limitations for inverse condemnation claims. Therefore, Randy's inverse condemnation claim is barred by the statute of limitations.

We note that the district court, in response to the City's motion to dismiss, relied on ripeness and claim preclusion in dismissing Randy's inverse condemnation claim. We reach the same ultimate conclusion, but we rely upon the applicable statute of limitations defense. We further note that the district court also concluded that Helen's takings claim was time barred. Because Randy received notice from the City of its implementation of the zoning ordinance upon the property at the same time, or earlier, than did Helen, Randy's claim would necessarily also be barred by the statute of limitations under the district court's analysis.

The Strodes' first assignment of error is without merit.

## 2. HELEN'S TAKINGS CLAIM

We turn next to Helen's zoning takings claim. The Strodes argue that the statute of limitations on Helen's separate claim for inverse condemnation did not begin to run until the completion of the 2003 litigation. In the alternative, the

Strodes argue that the time at which Helen received notice of the inverse condemnation claim is a disputed issue of material fact. The City contends that the statute of limitations began to run when the Strodes purchased the property in April 1999, because it was zoned as PUB at that time. Alternatively, the City argues that Helen's inverse condemnation claim is barred by claim preclusion, because she is in privity with Randy.

In dismissing Helen's claim, the district court held that Helen's claim relating to the zoning ordinance was barred by the statute of limitations, because (1) her interests in the property were acquired after the zoning ordinance was in place in 1998 and (2) she was aware of the effect of the zoning ordinance on the property since June 2003. We hold that Helen first had the right to institute and maintain a lawsuit in June 2003 at the latest, when the City sent written notification to Randy of the Strodes' nonconforming use of the property and its intent to institute legal proceedings.

[10] "Actions commenced under article I, § 21, are subject to a 10-year statute of limitations."[26] As we mentioned above, when applying a statute of limitations, we have held that "[a]n action accrues and the statutory time within which the action must be filed begins to run when the injured party has the right to institute and maintain a lawsuit, although the party may not know the nature and extent of the damages."[27] An aggrieved party has the right to institute and maintain a lawsuit "upon the violation of a legal right."[28]

As coowner with Randy of Block 16, Lots 7 through 12, and Block 21, Lots 10 and 11, of the property, Helen essentially has the same rights in those lots as Randy. The statute

---

[26] *Steuben v. City of Lincoln, supra* note 9, 249 Neb. at 272, 543 N.W.2d at 163 (citing § 25-202).

[27] *Id.* at 272-73, 543 N.W.2d at 163.

[28] *Reinke Mfg. Co. v. Hayes, supra* note 10, 256 Neb. at 452, 590 N.W.2d at 389.

of limitations began to run on Helen's takings claim "upon the violation of a legal right." Since Helen's rights in the lots are essentially the same rights as Randy's, the same act by the City to implement the ordinance that infringed or attempted to infringe upon Randy's rights in the property applies to Helen's claim.

Therefore, the statute of limitations began to run on Helen's takings claim at the same time as Randy's inverse condemnation claim. As reasoned above, the statute of limitations began to run on Randy's inverse condemnation claim when the City infringed upon the Strodes' right to use the property as they wished by exercising dominion over or obtaining an interest in the property and gave rise to their right to institute and maintain a lawsuit. As we held above, the statute of limitations began to run at the latest on June 10, 2003, when the City zoning administrator mailed Randy notice of his nonconforming use and the City's intention to institute legal action if the Strodes did not conform their use to the PUB designation of the property. Helen filed her action on September 5, 2013. This exceeds the 10-year statute of limitations for a takings claim. Accordingly, we hold that Helen's zoning takings claim is barred by the statute of limitations.

The Strodes contend that the time at which Helen received actual notice of the ordinance is an issue of material fact, making summary judgment inappropriate. Helen initially testified that she did not become aware of the ordinance until Randy mentioned it to her in June 2002; she later altered her testimony to say that it was not until May or June 2003. This coincides with the time that Randy received the letter from the City zoning administrator on June 10, 2003. While Helen stated in her testimony that she could not remember if she discovered the City's ordinance on the property because of the City's letter to Randy, the timing suggests that the letter was a reason why Helen learned of the ordinance. However, it was not necessary for Helen to know the "nature and extent

of the damages"[29] ultimately provided by the 2003 district court decision. The relevant inquiry is when the City infringed or attempted to infringe upon Helen's right to use the property as she wished and gave rise to her right to institute and maintain a lawsuit, not when Helen received actual notice of the ordinance affecting the property. Therefore, it is not an issue of material fact as to when Helen contends she received actual notice.

The district court reasoned that the statute of limitations had run on Helen's zoning takings claim, because she acquired the property after the zoning ordinance was in place and she was aware of the effect of the zoning ordinance on the property since June 2003. We reach the same conclusion as the district court, but we disagree with the district court's reasoning that actual notice is required for the statute of limitations to run.

Because we hold that Helen's claim is barred by the statute of limitations, we will not discuss whether Helen's claim is also barred due to the doctrine of claim preclusion. The Strodes' second assignment of error is without merit.

### 3. Bridge Takings Claim

In their third assignment of error, the Strodes argue that summary judgment was not appropriate because there is a genuine issue of material fact whether the load limit on the bridge allows reasonable access to the property. The City argues summary judgment was appropriate because the Strodes failed to show they were denied reasonable access to the property. The district court held the record was undisputed that there was reasonable access to the property via an underpass and via the bridge, provided the restrictions were observed. At issue is whether there is a dispute of material fact that the load limit on the bridge amounts to a taking.

---

[29] See *Steuben v. City of Lincoln, supra* note 9, 249 Neb. at 272, 543 N.W.2d at 163.

[11,12] Neb. Const. art. I, § 21, provides that the "property of no person shall be taken or damaged for public use without just compensation therefor." As we explained in *Scofield v. State*,[30] the U.S. Supreme Court has clarified the law surrounding regulatory takings claims and provided a framework under which such claims are to be addressed. This court has held that federal constitutional case law and our state constitutional case law regarding regulatory takings are "coterminous."[31]

[13] The U.S. Supreme Court has identified two types of regulatory actions that constitute categorical or per se takings: (1) where the government requires an owner to suffer a permanent physical invasion of his property, however minor, and (2) where regulations completely deprive an owner of all economically beneficial use of his property.[32] Neither applies here.

[14] Outside these two relatively narrow categories, regulatory takings challenges are analyzed using "essentially ad hoc, factual inquiries" governed by the factors set forth in *Penn Central Transp. Co. v. New York City*.[33] These include the economic impact of the regulation on the claimant, the extent to which the regulation has interfered with distinct investment-backed expectations, and the character of the governmental action.[34]

We have held that ""'"[t]he right to full and free use and enjoyment of one's property in a manner and for such purposes

---

[30] *Scofield v. State*, 276 Neb. 215, 753 N.W.2d 345 (2008).

[31] *Id*. at 231, 753 N.W.2d at 358.

[32] *Scofield v. State, supra* note 30.

[33] *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978). See, *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 106 S. Ct. 2561, 91 L. Ed. 2d 285 (1986); *Rodehorst Bros. v. City of Norfolk Bd. of Adjustment*, 287 Neb. 779, 844 N.W.2d 755 (2014).

[34] *Penn Central Transp. Co. v. New York City, supra* note 33; *Strom v. City of Oakland*, 255 Neb. 210, 583 N.W.2d 311 (1998).

as the owner may choose, so long as it is not for the mainte-
nance of a nuisance or injurious to others, is a privilege pro-
tected by law." " " "[35] This court recognizes that

> a property owner suffers a compensable damage on account
> of the construction or vacation of a public road when
> egress and ingress to his property are cut off or interfered
> with and he has no other reasonable means of access.
> The right of access under such circumstances is property
> which cannot be taken from him without compensation.[36]

And in their complaint, the Strodes allege the City's and
the County's actions through "limiting access to their property
have substantially diminished the values of [their] land and
business enterprises without compensation." Consequently, the
Strodes prayed for an order requiring the City and the County
"to properly repair and maintain the bridge structure" and
"[m]onetary damages for the loss of value and harm, tem-
porary and/or permanent, to [their] real property and busi-
ness operations."

[15] However, the U.S. Supreme Court clarified the extent of
the economic impact of a regulation required to receive com-
pensation. The Court recognized that in "instances in which
a state tribunal reasonably concluded that 'the health, safety,
morals, or general welfare' would be promoted by prohibiting
particular contemplated uses of land, this Court has upheld
land-use regulations that destroyed or adversely affected rec-
ognized real property interests."[37] Thus, land use regulations
"do not effect a taking merely because the regulation caused a
diminution in property value alone."[38] For example, this court

---

[35] *Scofield v. State, supra* note 30, 276 Neb. at 234, 753 N.W.2d at 360
(quoting *State v. Champoux*, 252 Neb. 769, 566 N.W.2d 763 (1997)).

[36] *Fougeron v. County of Seward*, 174 Neb. 753, 759, 119 N.W.2d 298, 303
(1963).

[37] *Penn Central Transp. Co. v. New York City, supra* note 33, 438 U.S. at
125.

[38] *Strom v. City of Oakland, supra* note 34, 255 Neb. at 220, 583 N.W.2d at
318.

has held that "one-third diminution in fair market value alone, if true, would be insufficient to establish a regulatory taking or damages."[39] And even if the landowner loses "50 percent of the value of the property, that level of diminution in value generally does not equate to a regulatory taking under U.S. Supreme Court precedents."[40] These cases concern land use regulations, but they are helpful in analyzing the economic impact of load limit regulations.

This court has held that diminution of property value due to regulation of streets that do not abut the property requires a greater showing of damages. In *Kraft & Sons, Inc. v. City of Lincoln*,[41] we held that a person may only recover for vacation of a street that does not abut his property if he has "sustained an injury different in kind, and not merely in degree, from that suffered by the public at large" and it is insufficient to show he must go "a more roundabout way."

In *Fougeron v. County of Seward*,[42] we held that a landowner could not enjoin a city from barricading one of two streets leading to his property when he could claim "only such inconvenience or injury as is suffered by the public generally, even though his inconvenience may be greater in degree." Therefore, mere inconvenience is not enough to claim damages.

The Federal Circuit explained that recovery for injury to investment-backed expectations is limited to those "'owners who can demonstrate that they bought their property in reliance on the non-existence of the challenged regulation.'"[43]

---

[39] *Id.* at 221, 583 N.W.2d at 319.

[40] *Rodehorst Bros. v. City of Norfolk Bd. of Adjustment, supra* note 33, 287 Neb. at 798, 844 N.W.2d at 770.

[41] *Kraft & Sons, Inc. v. City of Lincoln*, 182 Neb. 187, 190, 153 N.W.2d 725, 727 (1967).

[42] *Fougeron v. County of Seward, supra* note 36, 174 Neb. at 760, 119 N.W.2d at 304.

[43] *Good v. U.S.*, 189 F.3d 1355, 1360 (Fed. Cir. 1999) (quoting *Creppel v. U.S.*, 41 F.3d 627 (Fed. Cir. 1994)).

These expectations must be reasonable.[44] This court has held that "a property owner is presumed to know the law affecting his property."[45]

[16] In regard to the character of government action, the U.S. Supreme Court held that a "'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government."[46] In contrast to "when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good."[47]

The regulation prevents the Strodes from transporting their goods across the bridge in semitrailer trucks that exceed 14 tons. But the Strodes can use the railroad underpass for semitrailer trucks that exceed the 14-ton weight limit. Randy contends that this is not an adequate alternative, because the height of the railroad underpass is 11 feet 3 inches, and when he transports bulk amounts from his business, the semitrailer trucks usually reach 13 feet 6 inches. Randy testified that when he transports his fencing in smaller loads, he can use smaller trucks. The load limit on the bridge restricts Randy to using either semitrailer trucks that weigh less for access across the bridge or trucks of a limited height for access through the railroad underpass. This may be a "more roundabout way" to perform his business, in which he incurs some damages, but it does not constitute an injury different in kind than the general public, only different in terms of degree.[48]

---

[44] *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 104 S. Ct. 2862, 81 L. Ed. 2d 815 (1984).

[45] *Rodehorst Bros. v. City of Norfolk Bd. of Adjustment, supra* note 33, 287 Neb. at 798, 844 N.W.2d at 770.

[46] *Penn Central Transp. Co. v. New York City, supra* note 33, 438 U.S. at 124.

[47] *Id.*

[48] See *Kraft & Sons, Inc. v. City of Lincoln, supra* note 41, 182 Neb. at 190, 153 N.W.2d at 727.

The Strodes have failed to present any evidence that the weight limit of the bridge decreases the economic value of the property. Randy testified that it cost two to three times more to transport steel in smaller loads rather than in bulk, but he did not conduct any analyses to either substantiate this claim or determine how the property has diminished in value by the weight limits on the bridge.

Nor have the Strodes proved that the load limit interfered with any of their investment-backed expectations. The load limit was posted on the bridge at least as early at 1990, prior to the Strodes' purchase of the land. Any investment-backed expectations in the property based on the use of the bridge were not reasonable.

The character of the governmental intrusion also weighs in favor of the conclusion that there was no taking. The character of the governmental action was not a physical invasion of the land, but, rather, a regulation in place prior to the Strodes' purchase of the adjacent property. Based on the *Penn Central Transp. Co.* factors, the regulation of the bridge does not constitute a regulatory taking.

We conclude that the district court did not err in finding that summary judgment as to the Strodes' bridge takings claim was appropriate. There is no dispute of material fact that the load limit does not amount to a regulatory taking. The Strodes' third assignment of error is without merit.

## 4. REMAINING ISSUES OF MATERIAL FACT

Finally, the Strodes assign that summary judgment was inappropriate because issues of material fact exist. The Strodes argue that issues of material fact exist concerning whether either the City or the County has authority over the bridge and whether the County has authority over the PUB zoning classification of the property. They further argue that neither the City nor the County has met its prima facie burden with regard to the issues of causation and damages. The district court held that there were no issues of material fact.

Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[49] In the summary judgment context, a fact is material only if it would affect the outcome of the case.[50]

### (a) Authority Over Bridge

The Strodes argue that summary judgment is inappropriate because government authority over the bridge is unsettled. As we established above, the load limit of the bridge does not amount to a regulatory taking. Whether the City or the County has authority over the bridge does not affect the outcome of the case. Therefore, any dispute of fact concerning authority over the bridge is not a disputed material fact.

### (b) Authority Over PUB
### Zoning Classification

The Strodes contend that summary judgment is inappropriate because the County failed to provide evidence of its authority over the zoning ordinance. The County asserted in its answer that it does not have statutory authority to regulate or restrict the Strodes' use of the property in a way that could result in a taking, nor did it perform any act to regulate or restrict the Strodes' use of the property that could result in a taking. As we have already established, the passage of the ordinance does not amount to a taking of the property. The City passed and approved the ordinance. Only the City, not the County, has sought to enforce the ordinance against the Strodes. The disputed fact as to whether the County also had statutory authority to enforce the ordinance does not affect the outcome of the case.

---

[49] *Darrah v. Bryan Memorial Hosp.*, 253 Neb. 710, 571 N.W.2d 783 (1998).

[50] *Brock v. Dunning*, 288 Neb. 909, 854 N.W.2d 275 (2014).

(c) Issues of Causation
and Damages

[17,18] The Strodes argue that the City and the County have failed to produce evidence of causation. For an inverse condemnation claim to be actionable, the injured party has the burden of proving that the City's action or inaction was the proximate cause of the damages.[51] The proximate cause of an injury is that which, in a natural and continuous sequence, without any efficient intervening cause, produces the injury, and without which the injury would not have occurred.[52] It must also be shown that the invasion of property rights was intended or was the foreseeable result of authorized governmental action.[53]

The Strodes had the burden of proving that the City's action or inaction was the proximate cause of the claimed decreased economic value of their land due to the bridge's load limit. As stated above, the Strodes have failed to present any evidence that the weight limit of the bridge decreases the economic value of the property. They neither established that they sustained an injury different in kind from the general public nor that their injury was proximately caused by the City or the County. Furthermore, the Strodes have not asserted sufficient facts to establish the City and the County knew or could foresee that a load limit on the bridge would result in the taking or damaging of private property. Therefore, the Strodes have not established causation.

The Strodes wrongly contend that the City and the County have not met the prima facie burden with regard to damages. We have held that the initial question is whether the governmental entity's actions constituted the taking or damaging of property for public use.[54] Only after it has been established

---

[51] *Steuben v. City of Lincoln, supra* note 9.

[52] *Id.*; *Moore v. State*, 245 Neb. 735, 515 N.W.2d 423 (1994).

[53] *Henderson v. City of Columbus*, 285 Neb. 482, 827 N.W.2d 486 (2013).

[54] *Id.*

that a compensable taking or damage has occurred should consideration be given to what damages were proximately caused by the taking or damaging for public use.[55] The Strodes have not established that the City's or the County's actions constituted a compensable taking, and thus damages do not need to be addressed. The Strodes' final assignment of error is without merit.

## VI. CONCLUSION

The district court did not err in finding in favor of the City and the County. The decision of the district court is affirmed.

Affirmed.

---

[55] *Id.*