IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

ASCHOFF V. STATE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

GLENDA ASCHOFF, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE
ESTATE OF WILLIAM ASCHOFF, DECEASED, AND JOEL ASCHOFF, APPELLANTS,

V.

STATE OF NEBRASKA ET AL., APPELLEES.

Filed May 2, 2017.    No. A-16-249.

Appeal from the District Court for Buffalo County: JOHN P. ICENOGLE, Judge. Affirmed.

Andrew Wilson and Lawrence Roland, of Gross & Welch, P.C., L.L.O., for appellants.

Douglas J. Peterson, Attorney General, and Douglas L. Kleunder for appellee State of Nebraska.

Stephen L. Ahl and Krista M. Carlson, of Wolfe, Snowden, Hurd, Luers & Ahl, L.L.P., for appellees Werner Construction, Inc., et al.

MOORE, Chief Judge, and INBODY, Judge.

MOORE, Chief Judge.

## I. INTRODUCTION

Glenda Aschoff, individually and as personal representative of the estate of William Aschoff, deceased, and Joel Aschoff (collectively the Appellants) appeal from the order of the district court for Buffalo County which granted motions for summary judgment filed by Werner Construction, Inc., Werner Construction, Co., and Werner Construction, LLC (collectively Werner) and the State of Nebraska, and denied the Appellants' motion for partial summary judgment against Werner. Because the court properly granted summary judgment in favor of Werner and the State, we affirm.

- 1 -

## II. BACKGROUND

William was killed in 2011 while operating a bulldozer in a construction project for the Nebraska Department of Roads (NDOR) in which Werner was the general contractor. William's son, Joel, witnessed the aftermath of the accident. William and Joel were both employed by Commercial Construction, Inc. (CCI), who had been subcontracted by Werner, the general contractor on the Kearney East Bypass Project (the project), to perform grading work. This work included filling a large body of water (the lake) located on the project jobsite. As part of his job, William operated a bulldozer to push fill material into the lake. While William was doing so, the fill material collapsed and William and the bulldozer fell into the lake. William died of asphyxiation by drowning.

In 2011, the State, through the NDOR, retained Werner as general contractor to perform work on the project. The State owned the project jobsite. The project included construction of an exit ramp on I-80 near Kearney, Nebraska and other road work. The contract between the State and Werner provided that it was to be performed according to the construction plans, the NDOR specifications for highway construction, the contractor's bond, the proposal, and all special provisions of the contract. It also required work to be performed in compliance with the laws of the State of Nebraska, under the supervision of the NDOR, and in accordance with the rules and regulations of the Federal Highway Administration.

The "REQUIRED CONTRACT PROVISIONS" section of the contract stated that the contract applied to all work performed on the contract by the contractor and by any subcontractor. The required contract provisions were to be included in any subcontract. In the "SUBLETTING OR ASSIGNING THE CONTRACT" section, the required contract provisions provide:

> The contractor shall furnish (a) a competent superintendent or supervisor who is employed by the firm, has full authority to direct performance of the work in accordance with the contract requirements, and is in charge of all construction operations (regardless of who performs the work) and (b) such other of its own organizational resources (supervision, management, and engineering services) as the [State Highway Agency] SHA contracting officer determines is necessary to assure the performance of the contract.

And, in the "SAFETY: ACCIDENT PREVENTION" section, the required contract provisions provide:

> 1. In the performance of this contract, the contractor shall comply with all applicable Federal, State, and local laws governing safety, health, and sanitation. . . . The contractor shall provide all safeguards, safety devices and protective equipment and take any other needed actions as it determines, or as the SHA contracting officer may determine, to be reasonably necessary to protect the life and health of employees on the job. . . .
>
> 2. It is a condition of this contract, and shall be made a condition of each subcontract, which the contractor enters into pursuant to the contract, that the contractor and any subcontractor shall not permit any employee, in performance of the contract, to work in surroundings or under conditions which are unsanitary, hazardous or dangerous to

his/her health or safety, as determined under [federal] construction safety and health standards. . . .

The NDOR highway specifications provide that "[s]ubcontracts, or transfer of contract, will not release the Contractor of any liability under the contract and bonds." They also require contractors to notify the NDOR of "the specific differing conditions," which conditions include "subsurface or latent physical conditions which differ materially from those indicated in the contract" and "unknown physical conditions of an unusual nature and differing materially from those ordinarily encountered and generally recognized as inherent in the work provided in the contract." The State will investigate the differing conditions and if a change is warranted will modify the contract.

The NDOR highway specifications give the State's agent authority to decide all questions regarding the quality and acceptability of materials furnished, the work performed, the manner of performance and progress of the work, interpretation of the plans and NDOR specifications, fulfillment of the contract by the contractor, disputes pertaining to mutual rights between contractors, and determination of the existence of differing site conditions, among other things. The State's inspectors are authorized to inspect all work performed and all material furnished. The NDOR specifications also give the State's agent the authority to suspend work if the contractor fails to correct conditions unsafe to the NDOR personnel or the traveling public, carry out provisions of the contract, carry out orders of the State's agent, or follow the plans and specifications. The State's agent also has the authority to authorize a temporary suspension of operations, and to remove from the worksite any contractor or subcontractor employee who does not perform the work in a proper and skillful manner.

On July 18, 2011, Werner subcontracted with CCI to fill in the lake. The subcontract between Werner and CCI provided, among other things, that CCI was responsible:

> II. (a) To furnish . . . all labor, materials, supplies, tools, equipment, and services including field measurements necessary to complete [the work identified in the contract]. . . .
>
> . . . .
>
> VI. To protect his work of construction adequately and properly by lights, barriers, supports, signs and guards so as to avoid injury or damage to persons or property and to be directly responsible for damages to persons and property occasioned by failure to do so, or by any negligence of the Sub-Contractor or any of his officers, agents or employees in the performance of his work. . . .
>
> . . . .
>
> X. To comply with all applicable federal, state and municipal laws and/or ordinances and regulations effective where the work is to be performed under this Sub-Contract and to pay all costs and expenses connected with such compliance. . . .
>
> . . . .
>
> XIII. To meet all the requirements of the Occupational Safety and Health Act.

The subcontract also provided, "The Sub-Contractor agrees to assume entire responsibility and liability for all damages or injury to all persons, whether employees or otherwise, and to all property, arising out of, resulting from or in any manner connected with, the execution of the work provided for in this Sub-Contract. . . ."

The lake in question, about 38 feet at its deepest point, was a "borrow pit" from which fill material had been removed during interstate construction in the 1950s or 1960s. Groundwater subsequently filled the pit, creating the lake. Filling bodies of water is a common occurrence on construction projects, and CCI has performed such work "many times."

According to Melvin Joyce, an owner of CCI, Werner had no input into how the lake was filled and did not provide any instruction to or have any control over CCI employees while performing this work. Joyce testified that the lake in this case was the deepest such project he had worked on, though he had worked on filling some that were 20-plus feet deep. However, he never thought, at any time either prior to submitting CCI's bid for the project or after starting work, that the lake was "too big a hole to fill." CCI did not perform any hazard analyses prior to the accident and did not perform any hazard analysis "about pushing into the lake" until October 2011, after the accident occurred.

Richard Ray was Werner's safety director. He did not perform a job hazard analysis for the method being used to fill in the lake on this project, testifying that he would have relied on CCI to do that. He testified that it was the responsibility of subcontractors hired by Werner to follow Occupational Safety and Health Administration (OSHA) rules and regulations with respect to their employees. He would notify their boss if he observed them on a job site not following the rules; however, if he observed "something of a severe nature" that "needed immediate action," he would "go directly to the source." During his nearly 19 years working as Werner's safety director, Ray did not recall any other instances of Werner being involved in a project, either as a general contractor or a subcontractor, where an open water area had to be filled in. Robert Wemhoff, Werner's "project manager estimator," did not recall himself being involved with any Werner projects with such a large body of water to be filled as the one in this case, but he "guarantee[d] . . . that over the last 50 years," subcontractors hired by Werner had filled in "way bigger ponds."

On the project, CCI was responsible for finding a borrow site, securing the material to be used in filling the lake, and having it "approved by different agencies." Joyce testified that sand is the best material to use when filling a body of water because "it stabilizes itself" and was the material selected by CCI for use on the project. CCI used scrapers to load and haul sand from a "borrow pit" to the lake. The sand was then dumped 15-20 feet from the edge of the water, and a bulldozer was used to push the sand toward the edge of the water. According to Joseph Engler, the president and part-owner of CCI, there was no other feasible way to fill the lake. It was not possible to drain the lake and then fill it because of the high groundwater level at the jobsite.

In describing the process used by CCI to fill the lake, Joyce stated, "And they're supposed to leave that pile laying on top." He stated further, "They go back and they get another load in the dozer, push it ahead and use that pile to push the previous pile into the lake. So they always have a pile laying along that edge. They're supposed to work sideways . . . back and forth." When asked if the bulldozer operators were to push "straight ahead into the lake" or "at a different angle every pass," he replied, "[T]hey . . . make a push here. Then they move over a dozer width, make another

- 4 -

push, move over a dozer width, make another push. And they're always supposed to leave a pile laying on top." According to Joyce and Engler, CCI developed this method of filling the lake based on its prior years of experience.

In responses to requests for admission, Werner admitted that at the time of the accident, the construction site premises was under the joint control of Werner, CCI, and the State. Werner also admitted that it, along with CCI, was responsible for and supervised the area in which the accident occurred. In September 2011, CCI began filling the lake. Werner and CCI representatives both testified that Werner was not present at the lake site at that time. Wemhoff visited the site at least once between August 26 and September 30, but CCI was not working on the lake when he visited. Joyce stated that neither Werner nor the State had a work trailer at the site at the time of the accident. Raymond Smith, a surveyor for Werner, and his assistant were performing surveying work on a different area of the project, but they were not involved in filling the lake and had no interaction with CCI or its personnel.

On the morning of September 30, 2011, William was operating a Cat D9 bulldozer to help load scrapers in the borrow pit. At some point that morning, the Cat D6 bulldozer that was being used to push fill material into the lake broke down. The record shows that a D9 bulldozer is considerably larger in size and heavier than a D6. Joyce asked William to use the D9 to push fill material into the lake. William had prior experience filling other bodies of water, but because this was the first day William "pushed [fill material] into the lake" in this case, Joyce instructed William on how he wanted the lake filled. Joyce instructed William consistent with his description of the fill method set forth above. After explaining how he wanted the job done, Joyce watched William for 20 to 30 minutes. Joyce testified that during this 20- to 30-minute period, he did not see William deviate from the instructed method of filling the lake and that William operated the bulldozer safely and at a safe speed. Because William was following Joyce's instructions, Joyce thought "everything would be fine" and left "to go to a different part of the project." At some point thereafter, William's bulldozer fell into the lake, and William died. No eyewitnesses observed the bulldozer at the moment it actually fell into the lake.

Tom Farber testified that as NDOR highway project manager he was generally responsible for projects being built according to the plans and specifications for each project. As project manager on the project in this case, Farber was responsible for the safety of NDOR personnel. His daily responsibilities on this project included daily diary preparations and management of any on-site construction inspectors, as needed. As highway project manager, Farber did not have daily on-site meetings, and he did not direct contractors or subcontractors in their respective work on a daily basis. Farber testified that he could not control a contractor or subcontractor "as far as their work" and that they were responsible for their own work. He testified that it was the contractor's responsibility "to build it according to the plan. We inspect the work." Farber testified that the NDOR "as a department" was required to follow specific OSHA rules and regulations with respect to its employees, but that he did not have the ability to enforce those rules with contractors or subcontractors. Farber would not advise a contractor or subcontractor on anything dealing with safety or stop a particular activity unless there was something that created an imminent danger.

As highway project manager, Farber was required to know the standard methods and tests used by the NDOR for aggregate gradations, soil gradations, soil densities, and concrete

proportions. Farber testified that aggregate testing is done by the State's testing lab prior to the start of construction. Aggregate material is tested once for "a proctor or moisture density curve," which only indicates density and not how much weight an aggregate can hold or sustain. Farber clarified that the material used in this project was not an aggregate, but was a "sand-based fill." As highway project manager, Farber did not have any say in which borrow pit was used by CCI to obtain the fill material used in this project or in how the material was spread by the bulldozers after being dumped at the lake site by the scrapers.

Farber testified that the State's inspectors on this project did not perform any inspection "at the open water because there was no required density test, because [CCI] was just filling in the lake." Farber's inspectors might, in general, inspect fill density or embankment density, but the density of the fill as it was being placed in this case was not inspected because "it would have been underwater." Farber testified that the fill density at the open water site on this project:

> [W]as tested once it was almost full to a point where we were safe enough to go out on it and conduct a density test. We did not do any density testing in there until it was safe to be out there on top of it, because . . . the inspectors are out there in person. There's no vehicle or anything at that site.

Farber testified further as follows:

> Q. So a person, one of -- either yourself or one of your inspectors?
> A. Would have been the inspectors. I wouldn't have done it.
> Q. Gotcha. One of the inspectors does not go on the fill until almost all of the water has been filled in?
> A. Yes.
> Q. Because it's --
> A. Potentially unsafe.
> Q. What makes it potentially unsafe?
> A. Again, it would be the -- we don't -- I don't want anybody out there, my individuals.
> Q. But a bulldozer on it is okay?
> A. That's the contractor's decision.

The Appellants hired two expert witnesses, Douglas Dreessen and John Taylor, both engineers, and affidavits and reports from both experts were admitted into evidence.

Dreessen reviewed various photographs of the site taken after the accident occurred. He based his opinion on review of those photographs and an understanding that the accident occurred while William was operating a CAT D9 dozer on top of fill material in the lake where the accident occurred and that when the dozer was later retrieved from the lake, it was found to be in the reverse gear. Dreessen's report stated, in part:

> Fill placed in water is saturated and almost always light and weak. In this state, the fill is prone to sudden collapse which can be triggered by additional weight. Sandy soils are particularly vulnerable to vibration.

. . . . As the fill was first constructed, the buoyant force combined with the friction between soil particles, was adequate to support the material being placed above it and the machine(s) placing it. The fill continued to build until the weight of the fill and the machine and vibration overcame the strength of the saturated soil. This triggered the sudden collapse failure that almost instantly engulfed the bulldozer operator and his machine. The machine was between the water and stable soil when the sudden collapse occurred.

Additional information could substantially alter the stated observations and opinions.

Taylor provided opinions involving construction project management and construction work site safety. In forming his opinions, he reviewed various documents, a list of which he stated was attached to his affidavit as "Exhibit A." However, because "Exhibit A" was not attached to the copy of Taylor's affidavit in the record, it is not clear exactly what documents he reviewed, although he does reference certain documents in the opinion portion of his report. In his report, Taylor stated that both Werner and the State knew or should have known certain things, including the fact that "[w]orking near large bodies of water or on top of saturated soil is inherently dangerous work" and that filling in a large body of water would result in saturated soils and changing conditions on the worksite. Taylor opined as follows:

Based on the review of the information on this accident it is my opinion that [Werner] failed to fulfill its responsibilities in insuring and providing a safe workplace. As the Controlling Contractor, this key responsibility cannot be delegated by [Werner] to any Subcontractor. Further, the [State] observed the unsafe workplace, was qualified to recognize an unsafe worksite, and did not notify the contractors or stop the work.

These conclusions are specifically supported by [Werner's] response to the interrogatory #37 stating [Werner] relied solely on the Subcontractor to determine if the work site was safe and whether activities warranted hazard analysis. In my opinion, this in in direct conflict with the responsibilities of the Controlling Contractor to provide a safe work site. Specifically:

A. [Werner] failed to verify that subcontractor had experience in filling a body of water of this size and the subcontractor understood the inherent risks associated with the size and depth of the lake to be filled *(Subcontractor statement to OSHA that they had never filled a lake this big or deep using this method)*

B. [Werner] failed to review the work scope with the subcontractor to determine that procedures were in place to insure a safe workplace knowing that the conditions would certainly be changing daily as fill was added to the body of water. *(Subcontractor was cited for not having done a jobsite hazard analysis)*

C. [Werner] failed to provide any project oversight during the operation or take any other reasonable steps to insure a safe workplace. *(No documentation indicated any site visits or daily reports were produced by [Werner])*

D. The imported fill material became a part of the rapidly changing work site which created an inherently dangerous situation requiring special procedures and supervision. *(Confirmed by NDOR testimony)*

E. The [State] saw an obvious unsafe workplace and would not allow their employees onto the site. I observed no record that they notified [Werner] or [CCI] and instruct[ed] them to stop work or take corrective action.[ ]*(Awareness was demonstrated by the testimony that they felt the fill material that had been placed was unsafe for their own personnel to be on site).*

Based on my experience and training, the failure of fulfilling the above obligations allowed a dangerous condition to exist on the work site which ultimately resulted in the accident and death of William Aschoff.

(Emphasis in the original.)

In their amended complaint filed against the State and Werner, the Appellants asserted claims for wrongful death, negligence, and emotional distress. CCI was also named a plaintiff for workers' compensation purposes.

The State filed a cross-claim against Werner, alleging that the State was entitled to be indemnified for any damages awarded against the State as a result of negligence on the part of Werner. Werner filed a counterclaim against CCI, alleging that CCI's negligence was a proximate cause of the accident and that, pursuant to an indemnification agreement contained in a subcontracting agreement, Werner should be awarded judgment against CCI to the extent that any judgment was entered against Werner.

Werner and the State both filed motions for summary judgment. The Appellants filed a motion for partial summary judgment against Werner.

The district court heard the parties' motions on July 8, 2015. The court received into evidence depositions of representatives of CCI, Werner, and the State; reports from the Appellants' expert witnesses; the contract between the State and Werner; the subcontract between Werner and CCI; and other documentary evidence. We have detailed the relevant evidence above and have set forth additional evidence as necessary in the analysis section below.

On October 28, 2015, the district court entered summary judgment in favor of Werner and the State and dismissed the Appellants' claims. The Appellants perfected their appeal from a subsequent order, in which the court acknowledged that the cross-claim and counterclaim were dismissed.

## III. ASSIGNMENTS OF ERROR

The Appellants assert, reordered and restated, that the district court erred in (1) relying on evidence that was neither offered nor admitted as evidence, (2) granting summary judgment in favor of Werner and the State, and (3) denying the Appellants' motion for partial summary judgment.

## IV. STANDARD OF REVIEW

Summary judgment is proper when the pleadings and evidence admitted at the hearing disclose no genuine issue regarding any material fact or the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Strode v. City of Ashland*, 295 Neb. 44, 886 N.W.2d 293 (2016). In reviewing a summary judgment, an appellate

court views the evidence in the light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Id*.

## V. ANALYSIS

### 1. ARGUMENTS ABOUT EVIDENCE

The Appellants first assert that the district court erred in relying on evidence that was neither offered nor admitted as evidence. In its order ruling on the parties' motions for summary judgment, the court stated, "The court finds that the evidence as set forth in the [State's and Werner's] briefs and their arguments as to matters of law are persuasive and they are adopted and incorporated herein by this reference." The Appellants argue that the court improperly relied on the State's and Werner's briefs as evidence.

In connection with a motion for summary judgment, unless the evidence is marked, offered, and received, it does not become part of the record and cannot be considered by the trial court as evidence in the case. *Controlled Environments v. Key Industrial*, 266 Neb. 927, 670 N.W.2d 771 (2003).

We do not read the district court's statement in its summary judgment order as an indication that the court was relying on the briefs as evidence. Rather, we read the statement to show that the court had read the parties' briefs, reviewed the evidence referenced in the briefs that had been received at the hearing, and accepted the State's and Werner's arguments as persuasive.

We note that in Werner's brief and reply brief in support of its motion for summary judgment, it does cite to certain OSHA reports issued to CCI following the accident in this case. These reports were not admitted into evidence; however, Engler testified in his deposition about OSHA violations by CCI discovered following OSHA's investigation of the accident. Also, Taylor, one of the Appellants' experts, referenced the OSHA investigation and citation of CCI for violations in his report. These depositions were admitted into evidence. Again, we do not read the district court's statement in its summary judgment order as anything other than a statement that the court reviewed the properly admitted evidence. See *Molczyk v. Molczyk*, 285 Neb. 96, 825 N.W.2d 435 (2013) (appellate court presumes in bench trial that judge was familiar with and applied proper rules of law unless it clearly appears otherwise). The Appellants' first assignment of error is without merit.

We also note the Appellants' argument in their reply brief with respect to the deposition of Joyce, an owner of CCI. At the summary judgment hearing, the Appellants' attorney objected to the admission of certain portions of Joyce's deposition. They argued that Joyce had not been identified as an expert witness and objected to Joyce's testimony with respect to what Joyce observed of William's actions with the bulldozer on the date of the accident, his theory as to how and why the bulldozer fell into the lake, and a hazard analysis performed by CCI after the accident. The court stated that it would receive Joyce's deposition subject to the objections made and that the court would rule on the objections in its decision if it "[could] recall." The court did not make any evidentiary rulings in its summary judgment order. The Appellants did not insist on a ruling during the summary judgment hearing, and the record does not show any subsequent requests by the Appellants for such a ruling.

The Appellants argue that even though the district court "avoided ruling on" their objections to Joyce's deposition testimony, they preserved this error, and this court can determine the admissibility of the testimony to which they objected. Reply brief for appellants at 5. We disagree. The Appellants did not assign error to the court's failure to rule on their objections. The purpose of an appellant's reply brief is to respond to the arguments the appellee has advanced against the errors assigned in the appellant's initial brief. *Linscott v. Shasteen*, 288 Neb. 276, 847 N.W.2d 283 (2014). Errors not assigned in an appellant's initial brief are waived and may not be asserted for the first time in a reply brief. *Id.* Errors argued but not assigned will not be considered on appeal. *In re Trust Created by Nabity*, 289 Neb. 164, 854 N.W.2d 551 (2014). A party who fails to insist upon a ruling to a proffered objection waives that objection. *Diversified Telecom Service v. Clevinger*, 268 Neb. 388, 683 N.W.2d 338 (2004). If, when inadmissible evidence is offered, the party against whom such evidence is offered consents to its introduction, or fails to object or to insist upon a ruling on an objection to the introduction of the evidence, and otherwise fails to raise the question as to its admissibility, that party is considered to have waived whatever objection the party may have had thereto, and the evidence is in the record for consideration the same as other evidence. *Sturzenegger v. Father Flanagan's Boys' Home*, 276 Neb. 327, 754 N.W.2d 406 (2008). Because the Appellants did not insist on a ruling to their objection, they have waived that objection.

2. SUMMARY JUDGMENT

In order to recover in a negligence action, a plaintiff must show a legal duty owed by the defendant to the plaintiff, a breach of such duty, causation, and damages. *Pittman v. Rivera*, 293 Neb. 569, 879 N.W.2d 12 (2016). The question of whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation. *Id.* The duty in a negligence case is to conform to the legal standard of reasonable conduct in the light of the apparent risk. *Gaytan v. Wal-Mart*, 289 Neb. 49, 853 N.W.2d 181 (2014).

In outlining the law applicable to negligence actions by employees of independent contractors against those who hire independent contractors, the Nebraska Supreme Court has stated:

> Generally, one who employs an independent contractor is not liable for physical harm caused to another by the acts or omissions of the contractor or its servants. This is the general rule, because an employer of an independent contractor generally has no control over the manner in which the work is to be done by the contractor, so the contractor, rather than the employer, is the proper party to be charged with the responsibility of preventing the risk and bearing and distributing it.

> Our case law has recognized four exceptions to the general rule. Specifically, an employer of an independent contractor can be liable for physical harm caused to another if (1) the employer retains control over the contractor's work, (2) the employer is in possession and control of premises, (3) a statute or rule imposes a specific duty on the employer, or (4) the contractor's work involves special risks or dangers. We often refer to the latter three exceptions as involving 'nondelegable' duties. A nondelegable duty means

- 10 -

that an employer of an independent contractor, by assigning work consequent to a duty, is not relieved from liability arising from the delegated duties negligently performed.

*Gaytan v. Wal-Mart*, 289 Neb. at 57-58, 853 N.W.2d at 192-93.

The Appellants argue the first two exceptions to the general rule apply to their claims against Werner and the State. Although the Appellants cite certain Code of Federal Regulations provisions in their brief, they do not argue that these regulations imposed a specific duty on either Werner or the State. The Appellants do not explicitly argue the fourth exception, but to the extent that any of the arguments about the provision of a safe place to work are intended or can be construed to relate to the fourth exception, we note that it is not applicable to claims by employees of independent contractors against general contractors or owners. See *Gaytan v. Wal-Mart, supra* (vicarious liability principle as articulated in Restatement (Second) of Torts § 416 (1965) does not apply to personal injury claims by employees of subcontractors against general contractors or owners). Accordingly, we only address the applicability of the first two exceptions to both Werner and the State.

### (a) Control Over Work

When a general contractor or an owner of premises retains control over an independent contractor's work, the general contractor or owner has a duty to use reasonable care in taking measures to prevent injuries to workers. *Gaytan v. Wal-Mart*, 289 Neb. 49, 853 N.W.2d 181 (2014). See, generally, Restatement (Second) of Torts § 414 (1965); Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 56 (2012). To impose liability on a property owner or general contractor for injury to an independent contractor's employee based upon retained control over the work, the owner or general contractor must have (1) supervised the work that caused the injury, (2) actual or constructive knowledge of the danger which ultimately caused the injury, and (3) the opportunity to prevent the injury. *Gaytan, supra*. See, also, Restatement (Second), *supra*, § 414, comment b. While this necessarily means that the control exerted by the owner or general contractor must be substantial, it also necessarily means that the control must directly relate to the work that caused the injury. *Gaytan, supra*. Control over the work sufficient to impose liability on a general contractor or owner must manifest in an ability to dictate the way the work is performed, and not merely include powers such as a general right to start and stop work, inspect progress, or make suggestions which need not be followed. *Gaytan, supra*. See, also, Restatement (Second), *supra*, § 414, comment c. In examining whether an owner or a general contractor exercises control over the work, both the language of any applicable contract and the actual practice of the parties should be examined. *Gaytan, supra*.

### *(i) Werner*

We look to any relevant contract provisions and the actual practice of the parties to determine whether there was a genuine issue of material fact with respect to Werner's control of CCI's work. Werner argues that both the subcontract between Werner and CCI and the parties' course of conduct indicate that CCI maintained full control and supervision over the work of filling the lake.

The subcontract did not give Werner control over CCI's work. The subcontract states that CCI was required to follow reasonable directions when provided by Werner and to coordinate its work with Werner, but the subcontract did not give Werner control over the supervision and safety of CCI or its employees. Further, the subcontract affirmatively placed the burden on CCI to adequately protect its work through the use of safety equipment to avoid injury to persons or property and to be directly responsible for any damage caused by its failure to do so or by any negligence of CCI or its employees. The subcontract also placed responsibility on CCI to comply with OSHA and other laws and regulations and to pay costs associated with possible violations.

The Appellants rely on provisions in the contract between the State and Werner, but any general control of CCI's work provided by either contract is not enough to support a finding of liability under the control of work exception. See *Eastlick v. Lueder Const. Co.*, 274 Neb. 467, 741 N.W.2d 628 (2007) (no liability under this exception where general contractor had overall control of and generally supervised jobsite but did not control work done by or tools and equipment used by subcontractor's injured employee). The contracts in this case may have placed Werner in general control of the project jobsite, but they did not give Werner actual control over the details and manner of CCI's work. Nor did Werner exercise such control.

The record shows that CCI and Werner both understood the subcontract to place CCI in control over the work and safety related to filling the lake. Engler testified that Joyce served as CCI's safety director for "the grating [sic] division" and would address safety issues in the field as needed. Joyce testified that he was responsible for the area of the project around the lake and that his first priority was to ensure the safety of the people working for CCI and then to protect CCI's equipment. Ray, Werner's safety director, confirmed that filling the lake and safety related thereto, per the subcontract, was CCI's responsibility. He testified that he was not aware at any point prior to the accident of the method and manner that CCI would use to fill the lake as he did not speak to them about it, and he was unaware of the depth of the lake. Ray relied on CCI to perform any job hazard analysis for the method used to fill in the lake. And, he was unaware of any steps taken to prevent the risk of drowning while filling the lake, testifying that Werner had no policies with respect to life vests or such equipment because Werner did not work near water. He testified further that compliance with OSHA safety regulations was CCI's responsibility per the subcontract.

There was nothing in the subcontract between Werner and CCI giving Werner the authority to control the manner in which CCI filled the lake. As discussed further below, there is nothing in the record to show that Werner dictated or controlled the methods used by CCI in filling the lake.

### a. Supervision

The first requirement for application of the control-of-work exception is that the defendant supervised the work that caused the employee's injury. See *Gaytan v. Wal-Mart*, 289 Neb. 49, 853 N.W.2d 181 (2014).

Werner did not develop the method used by CCI to fill the lake and there is nothing in the record to indicate Werner monitored, supervised, or provided direction to CCI employees with respect to this work. Joyce testified that through his years of experience with CCI, he developed the method used by CCI to fill the lake, that no one at Werner had any input into the method used,

and that Werner did not provide any instruction to or control over CCI employees performing the fill work. Chris Engler, a CCI employee who was involved in pushing sand into the lake, the same job performed by William on the day of the accident, testified that Joyce was the only person who provided him with instructions as to how to perform the job and that he did not report to anyone on the job other than Joyce. Prior to William's accident, Engler had used both the D6 and the D9 bulldozers to push fill material into the lake. And, as set forth above, Joyce was the individual who provided instruction to William on the day of the accident. Finally, Werner did not have a presence at the site prior to the accident. Werner did not have a work trailer at the site at the time of the accident. Werner's project manager estimator visited the site prior to the accident, but CCI was not working at the lake at the time. A surveyor for Werner and his assistant performed surveying work on a different area of the project, but they were not involved in filling the lake and did not interact with CCI employees.

This is unlike the situation in *Gaytan, supra*. In that case, Wal-Mart hired a general contractor to construct a new store. The general contractor hired a subcontractor to install the steelwork, including steel sheets on the roof. While on the roof, one of the subcontractor's employees fell to his death when a decking sheet gave away. The employee was not wearing personal protection equipment. The employee's estate sued both Wal-Mart and the general contractor for negligence and both defendants were granted summary judgment in their favor. The Nebraska Supreme Court reversed the summary judgment with respect to the general contractor finding a genuine issue of material fact with respect to the general contractor's alleged control over the use of safety equipment on the roof. The subcontract provided the general contractor the general right to supervise the subcontractor's work and to require the subcontractor to resolve safety issues. Following the accident, OSHA cited the general contractor for not using a guardrail. The record also showed that the general contractor had supervisors on site, monitored the use of protective gear by the subcontractor's employees, developed a fall-protection plan for the subcontractor, oriented the subcontractor's employee who was killed, and instructed that employee with respect to safety.

In contrast, Werner did not have supervisory employees on site monitoring CCI's work, did not orient William, and did not provide him instruction in safe work practices. CCI performed the fill work using its own bulldozers and scrapers. William was instructed by Joyce in the method of filling the lake developed by CCI. The fill material collapsed and William's bulldozer fell into the lake either because the fill material was inadequate to support the weight of the bulldozer or because he failed to follow instructions given by Joyce. Under these circumstances, there is no genuine issue of material fact as to whether Werner supervised the work that caused William's death.

b. Knowledge of Danger

The second requirement for the control-of-work exception is that the defendant had actual or constructive knowledge of the danger which caused the injury. *Gaytan v. Wal-Mart*, 289 Neb. 49, 853 N.W.2d 181 (2014). There is no evidence of Werner's actual or constructive knowledge of the danger in this case. Constructive knowledge is generally defined as knowledge that one using reasonable care or diligence should have. *Gaytan v. Wal-Mart, supra*. In *Gaytan*, the

Nebraska Supreme Court found a genuine issue of material fact as to the general contractor's constructive knowledge of the danger posed by the failure of the subcontractor's employee to use personal protective equipment on the roof from which the subcontractor's employee fell even though the general contractor's employees did not have access to the roof. The Court made this finding because prior to the accident, the general contractor monitored the subcontractor's employees on occasion to ensure they were wearing protective equipment. Also, there was evidence that the failure of the subcontractor's employees to use protective equipment was so widespread, the general contractor should have known about it.

Here, there was no evidence that Werner monitored the use of safe fill methods at the lake site or had any representatives at the jobsite on the day of the accident. There was nothing to show Werner had reason to anticipate that William might not follow the instructions given to him by CCI or that the fill material selected by CCI would not support the weight of the bulldozer used by William on the day of the accident. Under these circumstances, there is no genuine issue of material fact as to whether Werner had actual or constructive knowledge of the danger which caused William's death.

c. Opportunity to Prevent Injury

The third requirement for the control-of-work exception is that the defendant have the opportunity to prevent the injury. *Gaytan, supra*. There is testimony from Wemhoff and Ray that if they observed a subcontractor performing an unsafe practice requiring immediate attention they would take corrective steps; however, simply having the right to stop unsafe work does not create a duty of care. One court has explained:

> Having the right to stop unsafe work is not enough to create a duty of care. *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 608, 46 Tex. Sup. Ct. J. 35 (Tex. 2002). A general contractor or an employer is not required to stand idly by while another is injured or killed in order to avoid liability. *Id.*

*Transit Mix Concrete & Materials Co. v. Johnson*, 205 S.W.3d 92, 95 (Tex. App. 2006).

While Werner might have been in a position to stop any unsafe work by CCI if it had been at the site of the accident, this does not mean Werner had an "opportunity to prevent the injury" as required by this exception. There is no evidence that Werner required CCI to comply with specific filling procedures and then negligently ignored an opportunity to ensure those procedures were followed. See *Gaytan, supra* (applying control-of-work exception where general contractor monitored personal protection equipment use but failed to do so on day of accident when lack of protection equipment use was widespread).

d. Conclusion as to Werner's Control of Work

Viewing the evidence in the light most favorable to the Appellants and giving them the benefit of all reasonable inferences, there is no genuine issue of material fact as to whether the requirements for the control-of-work exception have been met as to Werner. Accordingly, summary judgment in Werner's favor as to this issue was proper.

## (ii) State

As above, in examining whether the State exercised control over CCI's work, we look to language of the applicable contract and the actual practice of the parties. *Gaytan v. Wal-Mart*, 289 Neb. 49, 853 N.W.2d 181 (2014). Here, there was no contract between the State and CCI, but as noted above, the Appellants rely heavily on the contract between Werner and the State, arguing that it provided more than the general power to stop and start work. Regardless of the degree of control that the contract might have provided the State over work being performed at the project jobsite, there is nothing in the record to suggest that the State actually exercised control over the work performed by CCI in filling the lake which led to William's death.

### a. Supervision

The first requirement for application of the control-of-work exception is that the defendant supervised the work that caused the employee's injury. See *Gaytan v. Wal-Mart*, supra. As we noted above, the method used to fill the lake was developed by CCI. Farber, NDOR's highway project manager, testified that he had no say in the way the fill material was spread by CCI's dozers. The State did not have a work trailer at the site at the time of the accident. There is nothing in the record to indicate that any representative of the State provided instruction to or monitored the filling of the lake by CCI's employees. There is no genuine issue of material fact as to whether the State supervised CCI's filling of the lake on the day of the accident or at any time.

### b. Knowledge of Danger

The second requirement for the control-of-work exception is that the defendant had actual or constructive knowledge of the danger which caused the injury. *Gaytan v. Wal-Mart, supra*. Again, there is no indication that the State had supervisory personnel monitoring the use of safe filling of the lake or present to observe William's work on the day of the accident. The Appellants do not point to any evidence showing that the State had reason to anticipate that William might not follow his instructions from CCI or that the fill material selected by CCI would fail. Under these circumstances, there is no genuine issue of material fact as to whether the State had actual or constructive knowledge of the danger which caused William's death.

### c. Opportunity to Prevent Injury

The third requirement for the control-of-work exception is that the defendant have the opportunity to prevent the injury. *Gaytan, supra*. Farber testified that while he would not advise contractors or subcontractors with respect to safety, he would act to stop an imminent danger such as a live wire creating a danger of electrocution. However, as noted above, this does not create a duty of care. See *Transit Mix Concrete & Materials Co. v. Johnson*, 205 S.W.3d 92, 95 (Tex. App. 2006). There is nothing in the record to suggest that the State had an "opportunity to prevent the injury" as required by this exception.

### d. Conclusion as to State's Control of Work

Viewing the evidence in the light most favorable to the Appellants and giving them the benefit of all reasonable inferences, there is no genuine issue of material fact as to whether the

requirements for the control-of-work exception have been met as to the State. Accordingly, summary judgment in the State's favor as to this issue was proper.

(b) Control of Premises/Safe Place to Work

The Nebraska Supreme Court has recognized that one in possession and control of premises has a duty to exercise reasonable care to keep the premises in a safe condition while the contract is in the course of performance. *Gaytan v. Wal-Mart*, 289 Neb. 49, 853 N.W.2d 181 (2014). See, generally, Restatement (Second), *supra*, § 422, comment *c*. This duty relates to the physical condition of the premises, not the manner in which the work is done. *Id.* A general contractor or owner does not have to retain control of work in order to have a duty to provide a safe place to work. See *Id.* The Appellants rely on this exception in arguing that the district court erred in granting summary judgment in favor of both Werner and the State and in denying the Appellants' motion for partial summary judgment against Werner.

*(i) Werner*

Werner argues that at the time of the accident, CCI, not Werner, was in possession of the site where the lake was being filled. A possessor of land as defined in Restatement (Second), *supra*, § 328E is (a) a person who is in occupation of the land with intent to control it; (b) a person who has been in occupation of land with intent to control it, if no other person has subsequently occupied it with intent to control it; or (c) a person who is entitled to immediate occupation of the land, if no other person is in possession under clauses (a) and (b). Werner argues that prior to the accident, it never occupied the site where the lake was being filled; it did not have employees in the area; and had not placed a work trailer on the site. Werner argues that because control of the lake site had been turned over to CCI for their operations, they were the possessors.

The Appellants argue that this contradicts Werner's admission in its responses to requests for admission that the "construction site premises" was under the joint control of Werner, CCI, and the State. The Appellants also argue that any attempt by Werner to divide the project jobsite into numerous different worksites and pass on nondelegable duties to subcontractors violates public policy and would subvert the specific liability that was part of Werner's contract with the State.

Regardless of whether Werner is deemed a possessor of the area of the project jobsite in which the accident occurred, and thus had a nondelegable duty to exercise reasonable care to keep the premises in a safe condition while the contract was being performed, a "possessor can be liable only when the employee is injured because the workplace premises were not safe." *Gaytan v. Wal-Mart, supra*, 289 Neb. at 67, 853 N.W.2d at 198. In *Gaytan*, the decedent subcontractor employee fell when decking gave away because it was not properly secured. He was also not using any personal protection equipment at the time of his fall. The Nebraska Supreme Court found that while the record showed that the general contractor was in possession and control of the premises and thus had a duty to provide the subcontractor's employee with a safe place to work, the employee's injury was not proximately caused by any breach of that duty. In that case, the employee was not injured because of something unsafe about the premises where he was working; rather, he was injured "due to specific actions or inactions involved in the construction process."

*Id.* Thus, the Court concluded that any breach of the subcontractor's duty did not cause the accident and the injuries.

Similarly, the Nebraska Supreme Court found no evidence that the employee in *Eastlick v. Lueder Const. Co.*, 274 Neb. 467, 741 N.W.2d 628 (2007) was injured due to an unsafe workplace. In that case, the employee of a subcontractor fell and sustained serious injuries when the scaffolding he was working on collapsed. The evidence showed the employee incorrectly removed a brace on the scaffolding, which was owned, erected, and maintained by the subcontractor and not the general contractor. The Court found no evidence to show that the general contractor breached any nondelegable duty to provide a safe workplace.

In this case, what caused the bulldozer being operated by William to fall into the lake is disputed. Werner and the State generally contend that William failed to follow instructions when pushing sand into the lake. The Appellants generally contend that the fill material selected by CCI was inadequate and failed, causing the fill material to give way under the weight and vibration of the bulldozer. However, neither of these contentions involve a condition of the premises on which William was working. They involve the choices and decisions made by either William or CCI. Regardless of which of these possibilities actually caused the bulldozer to fall into the lake, the record shows that William's death did not occur because there was something unsafe about the premises on which he was working. William's accident and resulting death was due to specific actions or inactions involved in the construction process and any breach of Werner's duty to provide a safe work place did not cause the accident and William's death. There is no genuine issue of material fact with respect to this allegation of negligence and summary judgment in Werner's favor as to this issue was proper.

### (ii) State

Although the State contends that it was not in possession or control of the premises, we need not decide that issue. As set forth above, there is no genuine issue of material fact as to whether William's death was caused by an unsafe condition of the premises. Rather, his death was caused by CCI's or his own actions or inactions during the process of filling the lake. Thus, the State as a matter of law cannot be held liable to the Appellants under this exception and summary judgment in the State's favor as to this issue was proper.

### VI. CONCLUSION

The district court did not err in granting summary judgment in favor of Werner and the State or in denying the Appellants' motion for partial summary judgment.

AFFIRMED.

BISHOP, Judge, participating on briefs.